**ILLINOIS CENTRAL RAILROAD COMPANY, Appellant,**

v.

**Deboe HOUSE, Adm'r, etc., et al., Appellees.**

**ILLINOIS CENTRAL RAILROAD COMPANY, Appellant,**

v.

**McKinley DAVIS, Adm'r, etc., Appellee.**

Court of Appeals of Kentucky.

June 23, 1961.

Rehearing Denied Feb. 2, 1962.

Lively M. Wilson, Stites, Wood, Helm & Peabody, Louisville, for appellant.

John A. McCrea, Louisville, for Deboe House, Adm'r of estate of David House.

Richard H. Nash, Louisville, for Iva Albright, Adm'x of estate of Jerry Ray Phillips.

Edwin W. Paul, Louisville, for McKinley Davis, Adm'r of estate of Tommy Davis, for appellee.

MONTGOMERY, Judge.

Four boys were killed in a collision between an Illinois Central Railroad Company train and the automobile of Walter Druen, driven by his son Ronald. Julia Druen, administratrix of the estate of Ronald Druen, sued only the railroad. The personal representatives of the estates of the other three boys sued both the railroad and Walter Druen, owner of the car. The jury returned a verdict in favor of the railroad in the action for the driver's death and against the railroad and Druen in the other cases. The railroad alone appeals from the joint judgment totaling $37,898.09 against it and Walter Druen. One half of the judgment has been paid by Druen.

The primary question is whether the evidence discloses any negligence on the part of the railroad as the proximate cause of the accident. The court gave the usual instructions of ordinary care, lookout, con-

trol, etc., with the unusually dangerous crossing instruction added. The sufficiency of the evidence was questioned by appropriate motions before and after the verdict. Other questions are presented but it is unnecessary to discuss them.

The accident occurred in the afternoon of October 16, 1957. A light drizzle was falling. The place of the accident was the intersection of the Blevins Gap Road and the main line of the railroad 13 miles south of the city limits of Louisville. At this point, the track and U. S. 31–W, the Dixie Highway, are approximately one-half mile apart. They are substantially parallel. Blevins Gap Road has a blacktopped surface 17 feet in width. It runs in a straight line from the highway east to the point where it crosses the railroad right of way at right angles. The crossing is marked by a red highway Stop sign and the standard railroad crossarm sign a few feet from the track on the side from which the boys approached. In addition, there was a railroad crossing sign approximately 300 feet from the crossing as the boys approached it.

Ronald Druen, 16, was driving his father's 1950 Ford. He was accompanied by Tommy Davis, 17, David House, 15, and Jerry Ray Phillips, 13. All four boys lived in the vicinity where the accident occurred.

The three older boys, apparently, had started to go hunting. Immediately before the accident, they had stopped at Orell Feed and Hardware Store on Dixie Highway directly across from Blevins Gap Road. Davis purchased shotgun shells. Druen, the driver, was urging him, saying, "Come on, let's go, I'm in a hurry." Several hundred feet from the crossing, the boys in the car met the Phillips boy riding a bicycle. Phillips joined them. The car was started forward and driven into a collision with the locomotive. The boys were killed instantly.

The train involved was a steam locomotive pulling thirty-five cars loaded with freight. It was proceeding south at a speed of about 40 miles per hour as it approached the crossing. Its bell had been ringing continually since leaving the Louisville Yards. The whistle was sounded for the Orell Road crossing just to the north of the Blevins Gap crossing. The engineer began to blow the whistle about 800 feet from the crossing. At a point about 200 feet from the Blevins Gap crossing, the engineer saw the Druen car approaching the crossing. The auto was then about 200 feet from the tracks. The engineer immediately started a series of short shrill emergency blasts of the whistle to warn the car's occupants of the approach of the train. The regular whistle, as well as the distress whistle, was heard as far away as Dixie Highway by the man who had sold the boys the shotgun shells, by police officers as they drove down the highway, and by others.

The car did not slow its speed. The engineer, realizing the car was not going to stop, applied the brakes in emergency. It was impossible for him to stop the train before the collision.

Appellant insists that the Blevins Gap crossing was an ordinary road crossing and that adequate warnings were given of the approach of the train to the crossing, while appellees argue that the view of the approaching train was obstructed so that it made the crossing unusually dangerous or extra-hazardous, thus justifying the instruction given and the submission of the case to the jury. The question to be determined is whether the crossing was so hazardous that the warnings given were inadequate.

Broadly, the primary considerations affecting the status of particular crossings as unusually dangerous or extra-hazardous or not have been said to be (1) the ease with which travelers on the highway can detect the approach of a train, and conversely, the ease with which the operatives of the train can detect the approach of a traveler on the highway; and (2) the amount and character of the traffic over the crossing, either on the tracks or on the intersecting road or street. See Annotation, 5 A.L.R.

2d, Section 7, page 149, for the factors involved. The second consideration, the traffic involved, more appropriately would seem to concern the incidence of or the exposure to the hazard since the hazards involved are not made more or less dangerous by reason of the fact that many or few travelers may be exposed to them. Appellees urge that the crossing was used heavily by traffic.

The trial judge, in an opinion, said that the warnings given by appellant by means of bell, whistle, and signs, "were, in the language of the instruction, 'sufficient to give reasonable notice of the approach of the train to said crossing.'" He held that "The evidence in this case shows conclusively that defendant, Illinois Central Railroad Company, took precautions over and above those required by the Statute." We agree.

The problem is narrowed to a consideration of whether the view of the approaching train was obstructed. Appellees insist that trees, weeds, and brush growing on and near the railroad right of way so obstructed the view as to make the crossing unusually dangerous to the traveler approaching from the west. Several witnesses who lived in the neighborhood and used the crossing testified that a traveler in a car approaching from the west would have to be within 15 feet of the track in order to see an approaching train 200 feet from the crossing as described by the engineer.

Appellant introduced several photographs taken at distances of 330, 120, 90, 60, 45, 30, and 15 feet west of the crossing facing in the direction of the approaching train. They were taken the next day after the accident. The west line of the right of way was 38 feet from the center of the track. An examination of these photographs shows that the trees, brush, and undergrowth did not obstruct the view so as to obscure the approach of the train. As was said in Louisville & N. R. Co. v. Marshall's Adm'x, 289 Ky. 129, 158 S.W.2d 137, 139:

"They clearly demonstrate that the automobile did not have to approach the main line as close as those witnesses testified to in order for the occupant to discover by sight the approaching train from the direction in which the fatal one in this case was traveling, and which we conclude is much more persuasive than the mere opinion of the witnesses testifying to the contrary."

The photographs reveal nothing unusual about the crossing. It is a usual country crossing. The land is flat and the crossing is level. There is a slight embankment on each side of the track but clearly insufficient to conceal a locomotive from view. The photograph taken from the point 90 feet west of the crossing reveals a man walking on the track. The one taken 45 feet west shows the growth along the fence is so sparse that the rails of the track are visible. The engineer testified that the car was continuously visible as it approached the track from a point 200 feet west.

In Wadkins' Adm'x v. Chesapeake & Ohio Railway Co., Ky., 298 S.W.2d 7, 10, the Court said:

"While there was evidence that some weeds and vines had been permitted to grow near the company's right-of-way fence, this vegetation did not obstruct the view of a train from a passenger in an automobile or a pedestrian using the crossing. The testimony of the witnesses and the photographs and other exhibits appearing in this record conclusively established that this particular grade crossing was not made extrahazardous by the vegetation. Therefore, there is no basis for this contention."

The trial judge, in his opinion, indicated that he held the same view but felt impelled to give the unusually dangerous crossing instruction. See Louisville & N. R. Co. v. Crockett's Adm'x, 232 Ky. 726, 24 S.W.2d 580. The giving of the instruction, ap-

parently, was predicated on the theory embodied in Illinois Cent. R. Co. v. Peebles, 216 Ky. 9, 287 S.W. 574, in which the jury was permitted under an instruction to decide whether the railroad should or could have taken other precautions. However meritorious may be the trial court's criticism of the instruction approved in the Crockett case, the evidence here does not warrant the giving of the unusually dangerous crossing instruction. Piersall's Adm'r v. Chesapeake & O. R. Co., 180 Ky. 659, 203 S.W. 551; Cincinnati, N. O. & T. P. R. Co. v. Hare's Adm'x, 297 Ky. 5, 178 S.W.2d 835. As was said in Cincinnati, N. O. & T. P. R. Co. v. Howe's Adm'r, 207 Ky. 769, 270 S.W. 57, 58, "to apply the rule indicated to such a crossing would be to make the rule applicable practically to all country crossings." The motion for judgment notwithstanding the verdict should have been sustained.

Judgment reversed with direction to enter judgment for appellant.

PALMORE, Judge (concurring).

The opinion in this case unquestionably is right if the volume of traffic at a particular crossing is to be eliminated as a factor in determining whether it is extra-hazardous. However, I think it is a highly relevant factor, not to be ignored. Standards of care necessarily depend on what the public thinks—that is, in the form of settled and prevailing attitudes. When a jury is told to decide a case on the basis of what a reasonably prudent man would have done under certain circumstances we presume that its verdict is the measure of what society in general would think. Now, if a railroad crossing should be so congested with traffic that the public in general would expect the railroad company to have a man get off the train and flag the traffic out of the way, then that is the standard of care required of the railroad. After all, the unwritten or judge-made law is supposed to represent the attitudes of society, and the way we determine what society would think of a given fact situation, if there is fair room for difference of opinion, is to ask a jury.

Lest it be suspected that I sympathize with the ultra-modern Harper & James theory of liability without fault, let me hasten to disavow it, and strongly so. However, "fault" must always be determined on the basis of what the reasonable man, the composite of society at the time and place, would think and do, and in this case I think it was a fair question for the jury to determine whether in the exercise of due care the railroad should have maintained at this thickly traveled crossing some other and more effective warning (for example, a wig-wag, flasher, or ding-dong signal) of the approach of its trains.

There is, however, another theory on which the opinion can be supported without regard to whether the crossing was extra-hazardous. Although the instructions enumerated various duties on the part of the railroad, there was only one respect in which it really could have been negligent, and that was in failing to provide adequate and reasonable warning of the train's approach. The verdict against the driver's personal representative had to rest on one of two findings, (a) that the railroad was not negligent in this respect or (b) that the driver was contributorily negligent. Obviously, the verdict in favor of the passengers eliminates (a), from which it follows that the jury found the railroad negligent and the driver contributorily negligent. Analyzing the situation further, however, in the absence of any evidence revealing the details of the driver's conduct, how could he have been found negligent on any theory except that the jury thought the railroad had in fact provided sufficient warning to make it his duty to avoid the accident? And if the warning given by the railroad was sufficient for the driver, why would it not have been sufficient for all other users of the highway, including the passengers? As I see it, there is only one answer to these questions; and since the jury unmistakably

indicated its belief that the railroad had done all the things reasonably necessary in order to protect the driver it could not logically say the railroad had a different or greater duty with respect to the passengers.

In a fact situation as narrow as this I do not believe there is any room for a contributory negligence instruction, but since it was given it afforded the means by which the jury's true finding was revealed. That finding was that the various signs and signals provided by the railroad were reasonably sufficient to warn the driver, and if they were sufficient as to him they were sufficient for all other users of the highway, including the passengers.