ILLINOIS CENTRAL RAILROAD CO. et al.,
Appellants,

v.

Howell ARMS, Adm'r of the Estate of
Carolyn Ann Arms, Deceased,
Appellee.

ILLINOIS CENTRAL RAILROAD CO. et al.,
Appellants,

v.

Warner WHOBREY, Sr., Adm'r of the Estate
of Michael Ray Whobrey, Deceased,
Appellee.

ILLINOIS CENTRAL RAILROAD
COMPANY, Appellant,

v.

Henry BRAMER, Jr., Next Friend of LaVerne
Bramer, an Infant, Appellee.

Court of Appeals of Kentucky.

May 4, 1962.

Rehearing Denied Nov. 23, 1962.

S. Lloyd Cardwell, James W. Stites, Stites, Wood, Helm & Peabody, Louisville, Joseph H. Wright, John W. Freels, Chicago, Ill., for appellants.

Harold R. Marquette, Louisville, for appellees Arms and Whobrey.

J. D. Raine, Louisville, for appellee Bramer.

WILLIAMS, Judge.

A collision between an automobile driven by James D. Neal, Jr., and a train of the Illinois Central Railroad Company at a grade crossing resulted in the death of three young people and the serious injury of another. The administrators of the estates of Carolyn Ann Arms, Michael Ray Whobrey and James D. Neal, Jr., and LaVerne Bramer, by her next friend, respectively, sued the railroad company, Joseph Ryan, its engineer, and Warner Lee Whobrey, owner of the automobile, for damages. The administrator of James D. Neal, Jr., also was made a defendant in the actions other than for his death. An action for damages was filed by Warner Lee Whobrey, and cross-actions by the railroad company against him and Neal's estate were prosecuted. There were many other cross-actions and pleadings, but the complicated issues raised thereby and submitted to the jury are not involved on the appeals.

The cases were tried together and submitted to the jury under instructions about which no complaint is made as to form. Verdicts were returned against the railroad company and its engineer in favor of the estates of Arms and Whobrey for $10,000 each, for LaVerne Bramer for $5,000 and for Warner Lee Whobrey for $465. A verdict for the defendants was returned in the action by Neal's administrator. Instructions on contributory negligence of the other occupants, to whom the driver's negligence was not imputable, were given. Before the trial had been concluded, Warner Lee Whobrey, owner of the automobile, and James D. Neal's administrator agreed to pay in settlement of their liability $10,000 to the other party claimants, so that the judgments in the Arms and Michael Whobrey cases were reduced to $6,667.66 each and the Bramer judgment to $1,666.67.

Reversal of the several judgments is sought on the ground that verdicts should have been directed for the appellants, the railroad company and the engineer.

The accident occurred about 10:30 Sunday night, December 23, 1956, at Gagel Avenue in Shively, a suburban city of Louisville. The train, drawn by a large steam locomotive, was southbound. The automobile was westbound. The young people, whose ages ranged from fifteen to eighteen years, had been riding around since 3:30 that afternoon, stopping at homes of friends, hamburger drive-in restaurants and other places. It appears that they changed drivers and seats in the car from time to time. All of them lived in the general vicinity of Shively, and at least Neal, who was driving the car at the time of the fatal accident, was well acquainted with the crossing. The survivor of the accident, Miss Bramer, suffered head injuries and concussion of the brain and remembered nothing of the occurrence.

The plaintiffs introduced all the evidence bearing on the cause of the fatal accident, including that of the trainmen. The defendants developed their case on that issue by cross-examination.

The train was running 55 to 60 miles per hour; the headlight was burning, and both the engineer and fireman testified that they were keeping a lookout ahead. The engineer could not have seen this car approaching as it came from the east, or left, which was the fireman's side of the engine. The fireman testified he did not see any vehicle or lights of an approaching car. The

first he knew of its presence was when he heard the impact on the side of the locomotive, felt a "gush of air" and saw some object come before his cab window, which seemed to be going in the same direction as the train. He immediately called to the engineer to stop. The train "went into emergency." The engineer had his hand on the brake valve and immediately applied it but noticed at once that the "air went out." There were scratches and other marks on the side of the rear drivewheel and below the cab of the locomotive. The steps of the coal tender and engine were broken off. A water hose and air brake line between the engine and tender were broken. The car was dragged or knocked down the railroad track about 85 feet and landed in a ditch. The three bodies were thrown out, but the injured girl was in the car.

An automobile mechanic testified that the frame of the fatal car was bent to the left toward the front as if it had been "shoved around." A University of Louisville professor of physical science and a civil engineer, from an examination of the locomotive involved in this accident and upon hypothetical questions, testified, in substance and effect, that the front of the engine had struck the automobile.

The trainmen testified that the locomotive whistle had been blown for this crossing and the automatic bell was ringing as the train approached it. Indeed, it was ringing after the train had stopped. The negative testimony was of such character that the court ruled as a matter of law that these statutory signals (KRS 277.190) had been sounded, and the instruction did not predicate liability on a failure to give them or either of them.

The first instruction predicated liability upon the defendants' failure (a) to exercise ordinary care in running and operating the train, (b) to maintain a lookout for vehicles on or about to pass over the crossing or so near thereto as to be in danger of collision, (c) to have the train under reasonable control, and (d) to operate it at a reasonable and prudent speed under the circumstances. The instruction further stated that if the jury believed the railroad crossing was over a much traveled thoroughfare and because of its location and surroundings was unusually dangerous to travelers and that the ringing of the bell or sounding of the whistle was not sufficient to give reasonable notice of the approach of the train to the crossing, and the defendants knew, or in the exercise of ordinary care should have known this, then their duty was to use such other means to prevent injury to travelers, including the several deceased and the injured occupants of this automobile, as in the exercise of ordinary judgment might be considered necessary by ordinarily prudent persons. Accompanying this recitation of duties and breach thereof was the concomitant that the accident was proximately caused thereby.

The second instruction set out the duties of Neal, the driver of the automobile as follows: (a) to exercise ordinary care to learn of the approach of the train and to keep out of its way; (b) if the crossing was unusually dangerous and Neal could have known it to exercise increased care commensurate with the danger; (c) to keep a lookout ahead; and (d) to operate the automobile at a reasonable and prudent rate of speed.

We think it is immaterial whether the automobile struck the locomotive or the locomotive struck the automobile. It is apparent that they both arrived at the crossing at about the same moment. The difference in time as to which reached the crossing first is immeasurable. The decision cannot rest on that tenuous point. This distinguishes the case from cases where motor vehicles ran into standing trains or passing cars. Even in those cases, frequently the question of the motorist's negligence is one of fact for the jury. See Louisville & N. R. Co. v. Mahoney, 220 Ky. 30, 294 S.W. 777; Coil's Adm'x v. Chicago, St. L. & N. O. R. Co., 232 Ky. 33, 22 S.W.2d 428.

In general, the rights and duties of a railroad company and the traveling public in the use of grade crossings are mutual and reciprocal and each must exercise the degree of care commensurate with the danger, but trains have the right of way and all persons on the street or highway shall yield precedence to the trains. Harvey v. Illinois Cent. R. Co., 159 Ky. 492, 167 S.W. 875. The duties of the railroad company are defined in part by statute, in part by common law, and sometimes by city ordinances. There were no applicable ordinances in the present case. The common law embraces the duty of giving adequate warning of the approach of a train, of keeping a lookout ahead, and of operating the train at a speed commensurate with the care required under the circumstances. Piersall's Adm'r v. Chesapeake & O. R. Co., 180 Ky. 659, 203 S.W. 551.

The railroad company had erected and maintained signs on both sides of the track notifying the public of the presence of the crossing. These signs are prominent and noticeable in the daytime, although there is some evidence that they are not as clearly visible at night. (The latter circumstance is counterbalanced to some extent at least by the fact that the beam of a train's headlight provides a signal visible in the dark.) There is substantial evidence that a train coming from the north could have been seen by motorists.

Gagel Avenue connects the thoroughfare of U. S. Highway No. 31W and Manslick Road. The crossing is within the city limits of Shively, but the area around it is rather sparsely settled. There are several residences in the general vicinity. Photographs taken from the surface and the air reveal that visibility of the train was not particularly obscured. They reveal a slight curve in the street, but nothing that would prevent a motorist from observing the approach of a train if he were keeping a proper lookout.

Broadly speaking, the primary considerations in determining the character of a crossing are "(1) the ease with which travelers on the highway can detect the approach of a train, and conversely, the ease with which the operatives of the train can detect the approach of a traveler on the highway; and (2) the amount and character of the traffic over the crossing, either on the tracks or on the intersecting road or street." Illinois Cent. Cent. R. Co. v. House, Ky., 352 S.W.2d 819. It is our opinion that the facts do not substantiate a conclusion that this is an extra-hazardous crossing, and the verdict of the jury bears this out. There was no evidence introduced revealing the conduct of the driver of the automobile immediately before the accident. There is not one iota of proof concerning his speed, lookout or care, yet the jury found him negligent. The only ground on which that finding could have been based was that he failed to observe and heed the signs and signals provided by the railroad company. If he was negligent in not having seen and heeded the signals, it necessarily follows that the railroad could not have been guilty of any failure to provide sufficient signs and signals. Simply stated, the driver of the car could not have been found negligent unless the jury believed he had adequate warning, sufficient notice, of the approach of the train. (Cf. concurring opinion in Illinois Cent. R. Co. v. House, Ky., 352 S.W.2d 819.) Thus, although an instruction on extra-hazardous crossing should not have been given, nevertheless, since the jury found the driver negligent in failing to heed the signs and signals, it was tantamount to a finding that the railroad company did in fact provide sufficient notice, hence it was not injured by the instruction.

There having been no failure to provide sufficient or additional signs and signals at the crossing, any liability on the part of the railroad must stem from the manner in which the train was operated. As heretofore noted, the circuit court ruled as a matter of law that warning of the approach of the train, the bell and the whistle, had been given. The question then is, whether a

lookout was maintained by the operators of the train and whether the speed at which the train was traveling was reasonable, and, if the answer is in the negative, whether that failure was a proximate cause of the accident.

The train had left downtown Louisville 21 minutes before the accident occurred. It departed one hour behind the regularly scheduled time. As it proceeded south through the city of Louisville and through Shively its speed was increased to 55 to 60 miles per hour. The engineer was not instructed to and did not reduce the speed of the train at this particular crossing. The engine employed was a steam type where the engineer sits on the right side and keeps a lookout ahead and to that side and the fireman sits on the other side and keeps a lookout ahead and to the left. At the time of the collision there was rain and fog and visibility was poor. The automobile approached the crossing from the left or fireman's side of the engine. The fireman maintained he was keeping a lookout but saw nothing. The first indication he had of the crash was when he heard a noise, felt a gush of air and then saw a large object appear up in the air near his side window. The engineer knew the crossing was there. He blew the whistle as a warning of the train's approach. It was the duty of the trainmen to keep a lookout. In view of the fact that the engineer was not in a position to keep a lookout to the left side of the train it became the fireman's duty to keep such a lookout. Louisville & N. R. Co. v. Gilmore's Adm'r, 131 Ky. 132, 109 S.W. 321, 21 L.R.A.,N.S., 723, 33 Ky.Law Rep. 74, and Chesapeake & O. R. Co. v. Bradford, 202 Ky. 26, 258 S.W. 939.

■ The engineer testified that his primary interest in operating the train was to maintain his schedule. He had been given instructions to reduce the speed at various locations such as in cities or where track conditions required a slower speed, but had no instructions concerning this

crossing. The speed of 55 to 60 miles per hour had been maintained for some time since leaving Louisville and while passing through Shively. As heretofore noted, the accident occurred within the city limits of Shively, albeit within a sparsely settled area. In view of the fact that it was a dark, foggy night, the train should have been operated with a greater degree of care than would have been necessary during ordinary weather. Louisville & N. R. Co. v. Ueltschi's Ex'rs, 97 S.W. 14, 29 Ky.Law Rep. 1136. As was said in Chesapeake & O. Ry. Co. v. Coates, 271 Ky. 736, 113 S.W.2d 28, at page 32, "There is no fixed or settled rule as to what rate of speed the movement of the train may be declared, as a matter of law, reasonable. That question depends upon the circumstances and the facts developed in each particular case. It was therefore proper to submit to the jury the question of keeping a proper lookout, and whether or not the train was running at a reasonable rate of speed at the time of the accident."

The jury could have concluded either that the operators of the train failed in their duty to maintain a proper lookout or that the train was traveling at an unreasonable rate of speed under the circumstances, or both. The driver of the automobile failed to heed the warnings of the location of the crossing and approach of the train and was continuing his progress across the tracks. The operators of the train either failed to keep a proper lookout or were traveling at an unreasonable rate of speed, or both. The negligent act of the automobile driver and the negligent act of the train operators combined to cause the accident.

■ The negligence of the automobile driver cannot, of course, be imputed to the passengers; and, although it may be argued that they had the same notice or warning that the driver had, that circumstance does not imply negligence as a matter of law on their part, since there was no evidence to prove (and it was the railroad company's

burden to prove) any failure to do what they could in order to prevent the accident.

Judgment affirmed.

STEWART, C. J., and MONTGOMERY and BIRD, JJ., dissenting.