**Vincent J. HARGADON, Administrator of the Estate of Arthur Durward Frost, Appellant,**

v.

**LOUISVILLE AND NASHVILLE RAILROAD COMPANY, Inc., et al., Appellees.**

Court of Appeals of Kentucky.

Dec. 6, 1963.

As Modified on Denial of Rehearing March 13, 1964.

Michael M. Hellmann, Herman E. Frick, Louisville, for appellant.

Robert P. Hobson, Woodward, Hobson & Fulton, H. G. Breetz, M. D. Jones, Louisville, for appellees.

PALMORE, Judge.

Arthur Durward Frost was killed when a truck he was driving was hit by a southbound railroad train at the intersection of South Park Road (Kentucky Highway 1020) and the L. & N. tracks about a half mile south of the Bullitt-Jefferson County line. This action by the administrator of his estate against the railroad company for wrongful death resulted in a directed verdict for the defendant at the close of the plaintiff's evidence.

The principal question is whether Frost was contributorily negligent as a matter of law.

The crossing where the accident occurred is in a rural, sparsely settled area several miles south of Louisville. The topography is practically flat, with no buildings, trees or natural obstructions to impair the view of the railroad from the highway and vice versa. Proceeding from north to south the two run almost parallel, 60 to 70 feet apart, highway on the east and railroad on the west, for at least a quarter of a mile, and then the highway turns abruptly west by southwestward and crosses the double tracks of the railroad at what appears from the photographs to be an angle of about 70

degrees, so that it would be necessary for a southbound traveler on the highway, in making the turn and coming up to the crossing, to look more than 90 degrees to his right in order to have an unlimited lookout up the tracks to the north. The only fixed obstacles that might tend to interfere with such a view are a double row of telephone poles running along the strip between the highway and the tracks, a railroad cross-arm warning at the right margin of the highway several feet short of the crossing and a semaphore light post at the east edge of the tracks a short distance to the north. It is the plaintiff's theory that these vertical structures created a momentary "blind spot" and thus contributed to making the intersection an extrahazardous crossing.

Frost was employed by the Ford Motor Company as a dump truck driver. On the day of the accident he was hauling a load of waste material southward from the Ford plant in Jefferson County to a disposal area in Bullitt County. Having done the same thing three times a day for the past three years, he was familiar with the crossing and with whatever limitations were imposed on his northward view of the tracks by the attendant physical circumstances, including the fact that because the truck bed was higher than the cab he was dependent on his side mirrors for a rear view. According to the testimony of a witness driving immediately behind him, Frost was traveling about 40 m. p. h. until he reached the curve, when his brake lights came on and the truck slowed to a speed of "two or three miles an hour." The witness already had heard the whistle of the train, which evidently was approaching at a faster rate,[1] and "took it for granted that the truck was going to stop." However, "the tail lights of the truck went off and the truck went on into the track" and was struck on its right side as it crossed the west or south-bound set of tracks.

The accident happened at a little after 8:00 A.M. on a clear, cold October day.

Inspection of Frost's truck after the collision disclosed that it was in low gear and that the glass windows on both sides had been closed. It was equipped with rear view mirrors on each side of the cab.

There was some equivocal testimony, the probative value of which we need not assess, to the effect that the train whistle may not have been blowing, or its bell ringing, continuously for the full distance of 50 rods as required by KRS 277.190. However, the driver of the car following just behind Frost's truck heard the whistle well before these two vehicles reached the curve, and the driver of another car 50 feet farther back also heard it but, as he intended to turn left into a private lane before reaching the crossing, was not paying close attention and was not sure how far up the track the train was when he first heard the whistle. On the question of how much audible warning was given by the train, this was the most favorable evidence introduced in behalf of the plaintiff. All witnesses agreed that the whistle was being sounded as the engine passed through the highway and hit the truck.

■ Until the last 25 years or so, if there was evidence that the railroad had not complied strictly with KRS 277.190 (then Ky.Stat. § 786), the traveler struck by a train at a public crossing could not be held contributorily negligent as a matter of law unless there was positive proof that he had entered the crossing with knowledge of the train's approach. See, for example, Cox's Adm'r v. Cincinnati, N. O. & T. P. Ry. Co., 238 Ky. 312, 37 S.W.2d 859, 862 (1931). The rule was cryptically stated in Cincinnati, N. O. & T. P. Ry. Co. v. Fox, 269 Ky. 242, 106 S.W.2d 973, 975 (1937), as follows:

> "If one is injured at a public crossing and there is substantial evidence that the trainmen failed to keep a lookout or to give the statutory signals, the case is one for the jury."

---

1. This witness approximated the train's speed at 60 m. p. h.

Thus construed, the effect of the statute (KRS 277.190) was that a full compliance with its requirements was necessary in order for it to be said as a matter of law that the ordinarily prudent traveler on the highway had enough warning to keep him off the railroad track. In recent years, however, although the statute remains the same, its force and effect have been gradually watered down to the point that this relationship to the question of contributory negligence has been severed.

The process of transition was accomplished through enlargement of the exception existing when there was proof that the traveler actually knew of the train's approach. See Louisville & N. R. Co. v. Mitchell's Adm'x, 276 Ky. 671, 124 S.W.2d 1025 (1939) specifically relying on that exception.[2] In Louisville & N. R. Co. v. Brock's Adm'r, 281 Ky. 240, 135 S.W.2d 898 (1940), it was held that such knowledge could be conclusively established "by circumstances as well as by direct testimony," and that under the facts of that case "the circumstances described by the eyewitnesses to the accident point unerringly to the conclusion that decedent was bound to know of the approach of the train." Theretofore, something more than circumstantial proof of such knowledge had been required. Cox's Adm'r v. Cincinnati, N. O. & T. P. Ry. Co., 238 Ky. 312, 37 S.W.2d 859, 862 (1931). So strong, indeed, was this policy that for a time there was occasional reference to a "presumption" of non-negligence, the inaccuracy of which has been pointed out in the recent case of Louisville & Nashville Railroad Co. v. Fisher, Ky., 357 S.W.2d 683, 688 (1962). But the law today is the same in railroad cases as it is in other actions. That the railroad failed to give the warnings required either by statute or by the common law does not necessarily mean that there must therefore be a jury question as to whether, under all the circumstances of the case, there was enough warning to alert the ordinarily prudent traveler approaching on the intersecting thoroughfare. Nashville, C. & St. L. Ry. Co. v. Stagner, 305 Ky. 717, 205 S.W.2d 493 (1947); McCarter v. Louisville & Nashville R. Co., 314 Ky. 697, 236 S.W.2d 933 (1951); Hunt's Adm'r v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705 (1952). Louisville & N. R. Co. v. Troutman, Ky., 351 S.W.2d 516 (1961).

Upon a careful reconsideration of this position we judge it to be sound. The duties required of the railroad, especially by statute, in many instances may be far above what actually would be necessary for the protection of ordinarily prudent members of the traveling public. Like a bridge, they should be superabundantly designed to prevent the highly improbable as well as the probable, to protect the negligent as well as the careful. Therefore, what the law demands of the railroad cannot be decisive, or even materially helpful, in determining what the ordinarily prudent man in the position of the traveler would or would not do at a particular crossing at a particular time. This can be judged fairly only if it is judged separately, and on the same basis as any other case of contributory negligence.

The contention that the evidence was not conclusive on the question of Frost's own negligence is pitched mainly on the theory that the crossing was extra hazardous. The rationale of this theory is that there are some circumstances under which the ordinarily prudent person would not be sufficiently alerted by "the usual and statutory signals"[3] and would not appreciate the de-

---

2. See also Louisville & N. R. Co. v. Jackson, 286 Ky. 595, 151 S.W.2d 386 (1941), which did not involve a public crossing, but in which the railroad's possible failure to observe common law duties was eliminated on the theory that the victim's negligence was the proximate cause.

This concept has been followed in Hunt's Adm'r v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705 (1952).

3. Cf. Piersall's Adm'r v. Chesapeake & O. Ry. Co., 180 Ky. 659, 203 S.W. 551, 553 (1918).

gree of danger involved unless given greater warning of the actual approach of a train. See Illinois Central Railroad Company v. House, Ky., 352 S.W.2d 819 (1961), and Illinois Central Railroad Co. v. Arms, Ky., 361 S.W.2d 506 (1962).[4]

In addition to the heretofore mentioned physical circumstances contributing to the hazards of this particular crossing, the plaintiff introduced evidence of a traffic count showing in effect that in a 12-hour day it normally would be used by something over 1,000 vehicles on the highway, and that ⅖ of the 500 or so drivers going in the same direction Frost was driving at the time of the accident neither stopped nor reduced their speed in approaching the intersection.[5]

■■■ Evidence of frequent and constant use of a crossing by the traveling public is competent on the question of whether it was extraordinarily dangerous. Cox's Adm'r v. Cincinnati, N. O. & T. P. Ry. Co., 238 Ky. 312, 37 S.W.2d 859 (1931). Cf. Illinois Central Railroad Co. v. House, Ky., 352 S.W.2d 819 (1962). Perhaps this is because the doctrine seems originally to have applied "to dangerous crossings in incorporated towns and populous communities adjacent to cities." Cf. Barksdale's Adm'r v. Southern Ry. Co., 199 Ky. 592, 251 S.W. 656, 659 (1923); Southern Ry. Co. v. Barbour, 21 K.L.R. 226, 51 S.W. 159 (1899). But regardless of the amount of traffic, a review of the many decisions of this court in which the principle has been considered convinces us that it does not apply unless there is a real and substantial obstruction to sight or hearing. The latter must always be the major consideration. Moreover, the volume of traffic is a factor addressed primarily to the railroad's rather than the highway traveler's duties. In fact, the ultimate answer to the "extra-hazardous" argument in this case is that the principle

simply does not apply when the inquiry is confined exclusively to whether the highway traveler was contributorily negligent, because the hazards of the crossing, whatever they are and whatever their degree, are necessarily embraced in that inquiry anyway.

■■■ So we come back to the basic question: Under all the facts and circumstances of this particular case, was there room for reasonable, fair-minded men to differ on the question of whether Frost exercised ordinary care? We think the answer is perfectly obvious, and that the trial court's judgment was correct. The photographs demonstrate the absence of any real obstructions to the sight or hearing of a driver willing to make the slightest effort to see and hear. By far and away the major restrictions on Frost's ability to see and hear were imposed by the carapace of the truck he was driving. These were limitations of which he was fully cognizant. He was familiar as well with the physical characteristics of the crossing itself. The elementary rule that known hazards exact greater care from those who are exposed to them springs from the well-recognized fact of life that any ordinarily prudent person will exercise a caution commensurate with what he knows to be the situation confronting him.

■■■ It is further contended that the evidence warranted submission of liability to the jury on the theory of last clear chance. However, the facts of the case cited in support, Louisville & Nashville Railroad Co. v. Worthington, Ky., 354 S.W.2d 755 (1962), do not afford a valid comparison. The testimony in that trial justified a finding that the engineer could have stopped the train after seeing the automobile stalled or in difficulty on the track. Here, the engineer had no reason to anticipate that Frost,

4. Both involving crossings in the general area outlying Louisville, which were held not to be so unusually dangerous as to warrant special instructions on that theory.

5. Most automobiles, of course, afford the driver a better peripheral view than did Frost's truck. Otherwise, it would be hard to resist the inference that ⅖ of the drivers on this highway are negligent.

after slowing his truck to a crawl, would then attempt a crossing in the very teeth of the onrushing train, and, when he did attempt it, neither time nor distance was left in which anything could have been done to avoid the accident. If there was ever a case in which the last clear chance doctrine could not possibly apply, this is it.

■ During the trial the court excluded two items of testimony that are claimed to have been competent. One was an opinion by a state police officer, qualified as an expert on traffic safety, that the railroad crossing was "a very hazardous intersection," more dangerous than normal. Counsel recognize that this type of testimony was held inadmissible in Downing v. Drybrough, Ky., 249 S.W.2d 711 (1952), but express the hope that we are ready to recant, fulfilling Wigmore's prophecy that "the opinion rule will in substance disappear." Wigmore on Evidence (3d ed.), § 1929. Our uneasy experience, however, with the expert testimony of medical and real estate valuation witnesses leads us to suspect that if there should be a change in policy regarding opinion evidence it might be wiser to restrict than to enlarge its scope. Certainly we are not as yet prepared to let traffic experts thus invade the province of the jury.

■ The other item was a proffered showing that at another crossing half a mile north of the one involved in this case, leading to the L. & N. Golf Club, the railroad company maintained gates and warning bells and lights, suggesting that if such a standard of care was observed for the protection of those entering its private golf club it should also have been exercised toward the general public using the crossing on South Park Road. Wigmore (§ 461) again is called up in support, but we doubt if he had this situation in mind. Red carpet treatment at one place is neither evidence nor a measure of ordinary care at another.

■ Even if competent, the two types of evidence just discussed would relate only to the duties of the railroad company, and exclusion of the testimony could not have been prejudicial to the plaintiff's case on the decisive issue of contributory negligence.

The judgment is affirmed.