Walter C. THOMPSON, Individually and as Administrator of the Estate of Janie Underdown Thompson, deceased, Plaintiffs-Appellees,

v.

ILLINOIS CENTRAL RAILROAD COMPANY, Defendant-Appellant.

No. 19459.

United States Court of Appeals, Sixth Circuit.

April 10, 1970.

James G. Wheeler, Paducah, Ky., Wheeler & Marshall, Paducah, Ky., on the brief, for appellant.

Milton M. Livingston, Jr., Paducah, Ky., Dandridge F. Walton, Carroll & Walton, Paducah, Ky., on the brief, for appellees.

Before WEICK, EDWARDS and PECK, Circuit Judges.

WEICK, Circuit Judge.

Appellant, Illinois Central Railroad Company (the railroad), has appealed from judgments entered against it in the District Court on verdicts in favor of plaintiffs in the amounts of $25,000 and $2,350, in an action for damages for the wrongful death of plaintiff's wife, for her funeral expenses, and for damages to the automobile which she was driving, the action arising out of a collision with defendant's freight train at a grade crossing.

The accident occurred at about seven o'clock in the evening of December 29, 1967, on Schneidman Road in McCracken County, Kentucky, immediately south of the city limits of Paducah, where tracks

of the Paducah & Illinois Railroad cross said highway at grade [1]. It was dark at the time.

The sole issue raised in this appeal is that the District Court erred in denying the railroad's motion for a directed verdict and for judgment notwithstanding the verdict. These motions were based on the contention of the railroad that the decedent was contributorily negligent as a matter of law.

We are of the opinion, for the reasons hereafter given, that decedent was contributorily negligent as a matter of law. This diversity case is governed by Kentucky law.

Schneidman Road is about twenty feet wide, runs north and south, and is a heavily traveled thoroughfare in Paducah. It is intersected at grade by two separate tracks owned respectively by the Illinois Central Railroad and the Paducah & Illinois Railroad. They are single tracks running in an east-west direction, roughly parallel to each other at the crossing, and are separated by a distance of 167 feet. Cross-buck signs indicating the railroad crossing are located on either side of Schneidman Road at both tracks, and are visible to motorists approaching from either direction. The Paducah & Illinois track is slightly higher than the Illinois Central track.

Plaintiff and his wife had lived in the county for about eleven years prior to the accident and both were employed.

The decedent was 39 years of age. On the night of the accident she was driving her husband's automobile in a northerly direction on Schneidman Road. She first drove safely over the tracks of the Illinois Central Railroad, and proceeded 167 feet to cross the tracks of the Illinois & Paducah Railroad, directly in the path of the approaching freight train, and was struck broadside by the front locomotive. Her automobile was propelled across the tracks and came to rest in an adjacent lot on the northerly side of the tracks.

The freight train was about a mile long. It consisted of 107 cars which were being moved by two diesel locomotives. The front locomotive was equipped with a powerful sealed-beam headlight which shone 1000 to 1500 feet ahead and lighted the adjacent ground on either side of the tracks for about fifty feet. It was also equipped with an air horn and a bell signal.

The train crew estimated the speed of the train at from twenty to twenty-five miles an hour [2], and gave substantially the same estimate for the speed of the automobile operated by decedent. There was no slackening of speed of either the train or the automobile prior to the accident. When the train came to a stop, thirty-six cars had crossed Schneidman Road.

The train crew testified to the giving of the statutory signals [3] but this was disputed. Three persons, who were playing a game in a house near the tracks, testified that they did not hear the whistle or the bell. Plaintiff's witness, Troy E. Colson, who was driving an automobile in the opposite direction from decedent and had passed her just prior to the accident, testified that after he crossed the Paducah & Illinois track

—

1. Illinois Central Railroad Company was using the tracks of Paducah & Illinois Railroad Company pursuant to an agreement between the two railroad companies.

2. Plaintiff's witness, Colson, estimated the train speed at 35 miles an hour.

3. Kentucky Revised Statutes § 277.190 provides:
   "Bell to be rung or whistle sounded at crossings. Every railroad company shall provide each locomotive engine running over any of its lines with a bell of ordinary size and a whistle. The bell shall be rung or the whistle sounded, outside of cities, at a distance of at least fifty rods from the place where the track crosses upon the same level any highway or crossing at which a signboard is required to be maintained, and the bell shall be rung or the whistle sounded continuously or alternately until the engine has reached the highway crossing. In cities such signals shall be given as the legislative body of the city requires."

" * * * the train blowed [sic] the whistle. * * * It was one short whistle three or four seconds long and that was all." (T. 24)

The train was about three hundred feet away from the crossing when Colson heard the whistle blown. He did not hear the train's whistle or bell before that time.

While the positive testimony that the signal was given may be entitled to greater weight than the negative testimony of the witnesses who did not hear them, we are of the opinion that the weight of this evidence was for the jury to consider and the District Judge did not err in submitting to the jury the issue of negligence on the part of the railroad in failing to give the statutory signals. The railroad does not dispute this.

In considering the question whether a verdict should have been directed on the ground of contributory negligence, we are required to view the evidence, as well as the inferences justifiably drawn therefrom, in the most favorable light to plaintiff. Baird v. Cincinnati, New Orleans & Texas Pac. Ry., 315 F.2d 717, 720 (6th Cir. 1963). We must determine—

"Under all the facts and circumstances of this particular case, was there room for reasonable, fair-minded men to differ on the question of whether * * * [the plaintiff] exercised ordinary care?" Hargadon v. Louisville & Nashville R. R., 375 S.W. 2d 834, 838 (Ky.1964).

*Accord,* Louisville & Nashville R. R. v. Hines, 302 S.W.2d 553, 556 (Ky.1957).

The testimony of plaintiff's witness, Colson, who appeared to be the only disinterested witness to the accident, is most significant. Traveling in the opposite direction from the decedent, he crossed the higher (Paducah & Illinois) tracks just prior to the accident. He testified on direct examination:

"A * * * So I eased on up to the track, and as I approached the track, I was doing 30 at that time, around 30, and as I approached the track I slowed down, and I started up the grade and I was almost to a halt looking at the train to see if I had time to get over, it was coming from the west, and I seen I had time and I crossed on over the track, and as I crossed the track, I looked back at the train on the right, and as I started down the grade on the other side, the train blowed the whistle.

49 What type of whistle was it?

A It was one short whistle three or four seconds long and that was all.

50 How far was the train down the track at the time it tooted the whistle there?

A I figured it was about 300 feet.

51 Had the train ever blown its whistle or rung its bell before that time?

A No.

52 Now, what happened next?

A Well, sir, as I went on I started picking up speed, I went on over the grade, and there was another car approaching me coming to the north from the south, and me and the car passed about two thirds of the way between the tracks, from the high track to the low track, to the Illinois Central.

53 In other words, you got two thirds of the way between the tracks here?

A Yes, sir, and the lower track, which was the Illinois Central track, was a little rough on the other side, there was holes and places in it, and I had slowed down again to cross them tracks, and just as I crossed and started picking up speed again I looked up in the rear view mirror when I seen the car approaching on top of the track and the train struck it.

54 Did you actually see the striking of the train and automobile?

A Yes, sir, I did, in my rear view mirror. When the train hit the car, it looked like the car was scooped up from the track and sparks flying from it, and it looked like some pieces had flew off of the car too. It got outside my rear view mirror and I turned to my left to look and the car was done gone then." (T. 24-25)

Thus, plaintiff's own witness crossed these tracks just prior to the accident, saw the approaching train only 300 feet away, heard the whistle blow for three or four seconds, and proceeded toward the track of the Illinois Central when he passed the decedent's automobile going north, the witness having traversed almost two-thirds of the distance between the tracks. After passing Colson's automobile, decedent's view to her left was unobstructed for a distance of about 112 feet to the track where the accident occurred.

Colson further testified on cross-examination:

"27x Now when you came over the P & I track, the high track as you call it, you say you looked to your right?

A Yes, sir.

28x You saw the train coming?

A Yes, sir.

29x You saw the headlights beaming down the track, did you not? They were visible for a considerable distance, weren't they?

A Yes, they was hitting my car at that time.

30x Well you know, do you not, though you may not have measured it, that that straight course there back to the bridge over the Old Mayfield Road is about a thousand feet, don't you know that?

A Yes, sir.

31x You would say that is about correct according to this plat?

A Somewhere around a quarter of a mile or a little better.

32x So that anyone looking in that direction as you did when a train was coming with its lights on, could have seen it as far back as the bridge?

A Yes, sir, they could." (T. 33-34)

The map (plaintiff's Exhibit 4) indicates a distance of 167 feet between the two tracks at the crossing and a distance of 1031 feet from the center of the road at the crossing to the westerly bridge to which the witness referred in his testimony. The map also shows a distance of 202 feet from the south line of the Illinois Central right of way to the southerly track of the Paducah & Illinois Railroad.

As the decedent approached the tracks of the Illinois Central and was 202 feet from the Paducah & Illinois track, she had a clear and unobstructed view to the left for at least 1000 feet to the bridge, and if she had looked and listened she could have seen the approaching freight train and could have heard the whistle. Her view may have been obstructed for a few seconds when she passed Colson's automobile two-thirds of the distance between the tracks, but after passing Colson she still had a distance of about 112 feet to travel before reaching the higher track. At that time the train was less than 200 feet from the crossing. Her view to the left was unobstructed. Colson saw the train and heard the whistle. Had she looked and listened as Colson did, she also could have seen the train and heard the whistle, for she arrived at the crossing at the same time as the train. She could have brought her car to a stop. According to Colson, she was traveling only fifteen miles an hour at the time. She should have been able to stop within only a few feet. Colson was even able to observe the collision by looking into his rearview mirror after he had passed over the lower (Illinois Central) track. The darkness did not obscure his vision on this clear night. Plaintiff is bound by the testimony of his own witness. It was not controverted.

Engineer Barkley testified that he first observed the automobile operated by decedent when it was about 200 feet from the crossing and the train was about the same distance away. He testified:

"I didn't realize she wasn't going to stop until she drove up on the track. As slow as she was going, she didn't give any indication that she wasn't going to stop."

When he saw that she did not stop, he set the emergency brakes but the train then was already at the crossing.

In his brief, appellee states:

"Also, there were rough places or holes in the Schneidman Road around the Paducah and Illinois track (App. p. 45a)."

The record reference does not support this statement. The rough places and holes were on the other side of the lower track.

Appellee also states that south of the lower track there was located a house on the right side of the road, with a row of hedges running along the track which obscured decedent's view until she had practically reached the track. He also states that a warehouse was located on the left. Viewing these facts most favorably to plaintiff, we may infer that these obstructions distracted decedent's view of the upper track (where the collision occurred) until after she had actually crossed the lower track. However, there still remained 167 feet in which she had an unobstructed view of the upper track.

Appellee further states that between the tracks to decedent's right there was a row of trees which obscured vision in that direction. We may infer that decedent first looked to see if there were any trains coming from her right. This does not excuse her for not seeing a train coming from her left until it was too late to stop. Appellee also states that to the left, between the two tracks, there was an uncut field of sage full of weeds. There is no evidence that these weeds obscured decedent's view of the train's headlights.

It is apparent that decedent's view of the train was not substantially impaired. Even if there was some obstruction of her view looking down the track to her right, there was no obstruction of the crossing itself, which was marked by signs.

In Louisville & Nashville R. R. v. Troutman, 351 S.W.2d 516, 519 (Ky. 1961), the Court said:

"It is unquestioned that a railroad crossing is in itself a warning of danger and that a traveler having knowledge of its existence must exercise care for his own safety in such a degree as is proportionate to the danger then present or apparent of being struck by a train. * * *

"If he knows, or in the exercise of reasonable care and prudence must have known, of a train approaching by using his senses of sight and hearing in a way that an ordinarily prudent person would do under similar circumstances, and drives his automobile in front of the train, he assumes the risk of crossing in safety. If he miscalculates and is injured, he is guilty of contributory negligence." (Citations omitted)

Appellee contends that the crossing was extra-hazardous. He made the same argument in the District Court, which ruled against him. Since he filed no cross-appeal, the issue would not seem to be before us. The issue relates to the defendant's negligence rather than contributory negligence.

As was stated in Hargadon v. Louisville & Nashville R. R., *supra*, 375 S.W.2d at 838:

"In fact, the ultimate answer to the 'extra-hazardous' argument in this case is that the principle simply does not apply when the inquiry is confined exclusively to whether the highway traveler was contributorily negligent, because the hazards of the crossing, whatever they are and whatever their

degree, are necessarily embraced in that inquiry anyway."

The highest court in Kentucky has well stated the obligation of a motorist in approaching a railroad track.

"The obligation imposed upon every person to exercise ordinary care for his own safety requires that, in approaching a railroad track, he must use his senses in the way that an ordinarily prudent person would under similar circumstances, in order to determine whether it is safe to cross the track at that time. Where the facts make it certain that a traveler could have seen or heard an approaching train in time to avert a collision, had he looked and listened properly, he will not be heard to say that he looked for the train but did not see it, or that he listened for it and did not hear it." Lousiville & Nashville R.R. v. Hines, *supra*, 302 S.W.2d at 557.

*Accord,* Hunt's Adm'r v. Chesapeake & Ohio R.R., 254 S.W.2d 705, 709 (Ky. 1952); Nashville, C. & St. L. Ry. Co. v. Stagner, 305 Ky. 717, 719–720, 205 S.W. 2d 493 (1947).

In Meadows v. Chesapeake & Ohio R. R., 412 S.W.2d 233 (Ky.1967), the Court was faced with a situation similar in some respects to the one before us. The motorist approached a railroad crossing on a clear night. The crossing, with which the motorist was familiar, was described as extrahazardous because it carried heavy train traffic and the view was substantially obstructed until the motorist was within ten or fifteen feet of the tracks. The motorist stopped within fifteen feet of the track and then proceeded slowly across the tracks and was struck by a train. The Court observed:

"We are unable to comprehend how this accident could have happened if plaintiff took the precautions he said he did. Had he stopped, looked and listened as he testified, one wonders why he did not see and hear this train. Assuming he could not see or hear it at the point he stopped, he completely abandoned precautions as he slowly approached the crossing." *Id.* at 234.

Another problem germane to that in the present case was faced by the Kentucky court in Hargadon v. Louisville & Nashville R.R., *supra,* 375 S.W.2d at 836–837. In *Hargadon* there was some evidence that the train crew had not sounded the required statutory warning signals. In earlier Kentucky cases it had been held that evidence of negligence on the part of the railroad crew in failing to give statutory signals precluded the directing of a verdict for the defendant on the ground of contributory negligence, and required that the issue be submitted to the jury. Louisville & Nashville R.R. v. Ratliff's Adm'r, 260 Ky. 380, 85 S.W.2d 1006 (1935). Our Court in Baird v. Cincinnati, New Orleans & Texas Pac. Ry., *supra,* 315 F.2d at 722, cited *Ratliff's Adm'r* as authority for the proposition that a motorist has a right to rely on the train crew to give statutory signals. After reviewing the evolution of this rule, the Court in *Hargadon* held that the rule in Kentucky is no longer that the question of contributory negligence must be submitted to the jury where there is substantial evidence of a failure to give the statutory signals. It was stated:

"[W]hat the law demands of the railroad cannot be decisive, or even materially helpful, in determining what the ordinarily prudent man in the position of the traveler would or would not do at a particular crossing at a particular time. This can be judged fairly only if it is judged separately, and on the same basis as any other case of contributory negligence." Hargadon v. Louisville & Nashville R. R., *supra,* 375 S.W.2d at 837.

■ There can be no doubt today that the failure of a train crew to give statutory warnings is only one circumstance among a totality of circumstances to be considered, and such failure in no way diminishes the duty of the traveler to exercise reasonable care in crossing a railroad track. Cincinnati, New Orleans

& Texas Pac. Ry. v. Ferguson, 385 S.W. 2d 947 (Ky.1964); see Meadows v. Chesapeake & Ohio R.R., 412 S.W.2d 233, 235 (Ky.1967); Louisville & Nashville R.R. v. Dunn, 380 S.W.2d 241, 245 (Ky.1964); Chesapeake & Ohio Ry. v. Trimble, 306 S.W.2d 310, 312 (Ky.1957).

In Louisville & Nashville R. R. v. Fisher, 357 S.W.2d 683, 687 (Ky.App. 1962), the Court cited three of its more recent cases and said:

> "The above three cases have effectively overruled or at least limited the authority of Louisville & N. R. Co. v. Ratliff's Adm'r, 260 Ky. 380, 85 S.W. 2d 1006; * * *."

The decisions of the Court of Appeals of Kentucky in *Fisher* and *Hargadon* have thus weakened *Baird's* reliance on *Ratliff's Adm'r*. We are bound by the latest pronouncements of the Kentucky Courts.

Appellee has urged that two recent Kentucky cases demonstrate that the rule in Kentucky is that contributory negligence is always a jury question. We disagree. It is a legal axiom that any fact about which reasonable men can reasonably disagree is a question for the jury. If reasonable men could reasonably disagree about whether a plaintiff who was injured at a railroad crossing was contributorily negligent, then clearly the issue must be submitted to the jury; but if there is no room for disagreement, a verdict must be directed. The cases cited by appellee do not support his position. Louisville & Nashville R. R. v. Worthington, 354 S.W.2d 755 (Ky.1962), affirmed the judgment of the trial court which had submitted the issue of contributory negligence to the jury. The jury returned a verdict for the plaintiff. The Court of Appeals of Kentucky relied on the fact that there was competent evidence that the railroad had the last clear chance to avoid the accident after it discovered plaintiff's peril. Once a finding was made that the railroad had the last clear chance, the negligence of the plaintiff was not a defense. Our case does not involve last clear chance.

The rule for this Court to follow in determining whether the decedent was contributorily negligent as a matter of law was best stated in Louisville & Nashville R. R. v. Troutman, *supra*, 351 S.W.2d at 519:

> "Where there is reasonable room for a difference of judgment upon positive or inferential facts, the question of contributory negligence is for the jury. But when evidence in a given case is susceptible if only one reasonable inference with respect to a controlling issue, the question becomes a matter of law for decision of the court. In the present case the conditions surrounding the crossing and the facts of the accident are without contradiction. We conclude that the trial court should have directed a verdict for the defendant on the ground of contributory negligence of the plaintiff's decedent."

Nor is appellee aided by Louisville & Nashville R. R. v. Quisenberry, 338 S. W.2d 409 (Ky.1960). As the Court there stated:

> "The testimony and exhibits disclose that this was a highly dangerous crossing and was so constructed that neither the engineer nor the decedent had enough time to do anything to prevent the accident after they came within view of each other." *Id.* at 410–411.

Under the circumstances of that case it is clear that failure by the train crew to give audible warnings had a very direct bearing on whether decedent was exercising due care when he crossed the track. It was a jury question whether such warnings were given and, therefore, a jury question whether decedent was exercising due care.

We conclude that the District Court erred in not directing a verdict in favor of the railroad. The judgments are reversed and the cause is remanded with instructions to dismiss the complaint.