MERRITT, Circuit Judge.
 

 Defendants, Johnny Baylor and KoKo Records, Inc., appeal a jury verdict that would require them to return $2.5 million received as royalties and promotional fees from Stax Records, Inc., a company now bankrupt. The bankrupt’s trustee brought suit under section 70(e) of the Bankruptcy Act, now 11 U.S.C. § 544(b), claiming that under the Tennessee law incorporated by the federal statute, the $2.5 million constituted a fraudulent conveyance recoverable by the trustee. Defendants claim the evidence is insufficient to support a finding of fraud and make other claims of error in evidentiary rulings and instructions. We affirm.
 

 Defendant Baylor was employed by Stax from 1968 to 1973 as a promoter of record sales. He also owned and operated defendant KoKo Records, Inc., a company that recorded and distributed music and used Stax production facilities. Both companies concentrated on the distribution of recordings by black musicians to predominantly black consumers. Either on his own label or on that of Stax, Baylor distributed recordings by such successful performers as Isaac Hayes, Luther Ingram, Johnnie Taylor, and the Staple Singers. Beginning in late 1972, Baylor received several large
 
 *1160
 
 lump sum payments totalling over $2.5 million from Stax. The payments were received under what Baylor alleged to be retroactive oral modifications of an earlier agreement. The oral agreements were negotiated on behalf of Stax by Al Bell, by late 1972 the president and sole shareholder of Stax and a close friend of Baylor’s. They provided that Baylor would receive (1) all income generated through sales of KoKo label products after Stax’s costs of producing KoKo records had been met; (2) specified royalties for each distributed Stax products; and (3) a flat $1 million for promotional services.
 
 [1]
 

 These agreements preceded a period of declining economic fortune for Stax. After 1971, its record sales fell. As early as 1970, according to testimony by plaintiff’s expert, Stax’s debt exceeded its assets. By 1973, the year in which Baylor received most of his money, debt was nearly twice the value of assets, exceeding them by more than $10 million (Tr. 371). In 1972 CBS loaned Stax $6 million in return for a distribution agreement, and it was only that infusion of cash that provided the company with the means to pay Baylor the $2.5 million.
 

 A petition for- involuntary bankruptcy was filed December 19, 1975. The trustee in bankruptcy, holding less than $1 million in assets subject to approximately $25 million in claims by more than 200 general creditors, filed this suit against Baylor and KoKo on January 27, 1977. He claimed that the payments to Baylor constituted fraud or constructive fraud under applicable Tennessee law, Tenn.Code Ann. §§ 64-312 to 64-315. The case was tried to a jury, and it found that Baylor had engaged in actual fraud under Tenn.Code Ann. § 64-315 and therefore did not reach the question of constructive fraud.
 
 [2]
 
 It awarded to the trustee the $2,541,409.54 he sought. Judgment was entered October 25, 1978. The district court denied post-trial motions, and defendants filed a timely appeal.
 

 I.
 

 In reviewing civil jury verdicts to determine whether the evidence is sufficient to support the judgment, we follow the traditional rule of viewing the evidence in the light most favorable to the prevailing party. The question on appeal is whether there is room for reasonable minds to differ on the question of whether Baylor knew of or participated in a scheme to defraud Stax creditors.
 
 See, e. g., Thompson v. Illinois Central Railroad,
 
 423 F.2d 1257 (6th Cir. 1970). Viewed in that light, the evidence in this case provides ample support for the jury verdict.
 

 In support of his claim that he is entitled to the $2.5 million Stax gave him in an eight-month period beginning in late 1972, Baylor relies on two oral novations, one retroactive, of a written agreement made in 1968, when he first began to work for Stax. Aside from royalty statements, there is no documentation of the agreement. Plaintiff’s expert testified that he had never before heard of a similar unwritten agreement in the music industry (Tr. 392). One novation, made in late 1971 or early 1972, allegedly adjusted the rates for royalty payments to Baylor for sales of Stax records. The second novation, made in March or April 1972, allegedly provided for $1 million in promotional fees, fees to be paid above travel and other business expenses and independent of the number of
 
 *1161
 
 records actually sold. The novations replaced an agreement typical of agreements in the record industry, putting in its place conditions that were by industry standards extraordinarily generous. Baylor was to receive royalties on seven-inch records (singles) of $.22 to $.26 per record and on twelve-inch records (LPs) of $1.62 to $1.85 per record (Tr. 148-59), as compared to industry norms of $.08 to $.13 on singles and $.30 to $.60 on LPs (Tr. 397). Baylor himself testified that a royalty rate of $.25 per single would be “out of reality” (Tr. 1333). Those rates applied, moreover, to returns and free goods as well as records sold, another feature unusual in the industry.
 
 [3]
 
 The rates were to be retroactive to the first record Baylor sold for Stax, approximately three years earlier. Baylor’s flat $1 million promotional fee compares to industry norms of $60,000 to $70,000 per year (Tr. 471). Baylor argues that his unique talents justified those extraordinary terms, but he conceded that nothing he has done before or after his association with Stax would indicate that he possesses unusual money-making talents (Tr. 534). He took over full responsibility for Stax distribution in late 1971 and gave it up in late 1972, when CBS took over distribution rights. Sales fell from $17.1 million in 1971 to $13 million in 1972 (Tr. 1465).
 

 Baylor and Bell testified inconsistently on the timing and terms of the claimed nova-tions. Bell insisted that there were two separate novations, the second prompted by Baylor’s complaints to him. Baylor could not remember two separate agreements. He asserted, moreover, that his understanding was that he was to get nothing if he did not sell records and make money for Stax. That understanding, however, is inconsistent with his receipt of $1 million for promotional services. A Stax lawyer, Craig Benson, stated in a deposition read at trial that Bell asked him in April 1973 to prepare a contract embodying the terms allegedly a part of the oral novations and to backdate it to October 15, 1968 (Tr. 699). The first payment to Baylor made under the terms of the novation, a $500,000 check dated November 30, 1972, was first entered in the Stax books as a loan. That description was changed to royalty payment, and then to promotional fee. The chief financial officer at Stax testified that Bell told him to make the alterations (Tr. 168). Baylor testified that the $500,000 check represented payment of royalties.
 

 Neither Baylor nor Bell denies that they were good friends who talked and met with each other regularly. Bell testified that Baylor “was very familiar with the inner workings of the company” (Tr. 635). Bell testified that Baylor knew the company was nearly bankrupt. He knew that had Stax not received a $6 million loan from CBS, he could not have been paid the money due him under the alleged agreement.
 

 The tax treatment of the arrangement by both Stax and Baylor was unusual. Stax took no deductions for the payments to Baylor, though it was entitled to, and Baylor took no deductions aside from attorneys’ fees for any expenses incurred in his work — no expenses for traveling, for other employees, or for any other outlays.
 

 Baylor’s credibility was a central issue at trial, and he provided ample evidence by which the jury might have concluded that he was not a credible witness. He frequently avoided giving direct responses to questions and regularly provided testimony inconsistent with his own and others’ testimony. His testimony about how he came to possess the more than $129,000 cash found by federal agents along with a $500,000 check from Stax at the Birmingham airport in late 1972 was particularly unpersuasive. He could not remember where all the cash had come from. He testified that he had carried thousands of dollars with him from city to city since the beginning of 1972 and that he had won $50,000 in three days betting on horses (Tr. 1347-59).
 

 
 *1162
 
 Whether or not the transfer of $2.5 million from Stax to Baylor can
 
 only
 
 be explained as a deliberate fraud on Stax creditor’s, the jury’s verdict to that effect is a reasonable one. Taking into account all the facts, presented in the twelve day trial by the twenty-one witnesses who testified, we cannot say that the evidence was insufficient or the verdict irrational.
 

 II.
 

 In addition to their claim of insufficient evidence, defendants claim that the trial court committed reversible error in three evidentiary rulings and in four instructions. None of their contentions are persuasive.
 

 A. Evidentiary rulings
 

 Defendants tried to introduce through Stephen Hockhauser, Baylor’s attorney, royalty statements sent by Stax along with the $1 million check to Baylor. Baylor told Hockhauser that the statements were inaccurate because they understated the figures for records sold, and that Stax actually owed him much more. Defendants presumably believe that the statements along with the testimony of Hockhauser would indicate that Baylor genuinely believed he was entitled to everything he received and therefore had no intent to defraud Stax. At trial defendants argued for the admissibility of the statements on two grounds. They argued that they were admissible as exceptions to the hearsay rule under Fed.R.Evid. 803(3) — the state of mind exception — and Fed.R.Evid. 803(6) — the business records exception. Both exceptions are clearly inapplicable. Rule 803(3) provides that a “statement of the declar-ant’s ... state of mind” is admissible. The declarants in this instance are the royalty statements, and the trial court was properly uninterested in their state of mind. Rule 803(6) is inapplicable because the witness, Hockhauser, played no role in the creation or compilation of the records and was therefore in no position to attest to their reliability. If the statements were admissible at all through Hockhauser, it would be because they were not offered for the truth of the matter asserted and were relevant to Baylor’s state of mind. It is part of defendants’ arguments, in fact, that the statements were not accurate representations of what they purported to be, that Baylor was in fact owed more than they indicated he was. In ruling on post-trial motions, the district court concluded that the statements were not relevant to Baylor’s state of mind because it was unclear whether Baylor himself ever saw all of them. The trial transcript supports that conclusion. Defendants offered into evidence a pad of royalty statements, received from Stax at different times (Tr. 870). Hockhauser did not testify that he showed all of them to Baylor, and defendants made no effort to separate those he had shown him from those he had not. For purposes of demonstrating Baylor’s state of mind, moreover, the statements would have been cumulative evidence less persuasive than other evidence that was admitted. Baylor testified to his belief that the royalty records understated Stax’s debt to him. Hockhauser was permitted to testify that Baylor told him so (Tr. 864), and Seymour Heinberg, Baylor’s accountant, stated in a deposition read at trial that Baylor told him the same thing (Tr. 1192).
 

 The two other claims of error in evidentiary rulings relate to statements made by Al Bell and Edward Pollack. Defendants claim that because Bell and Pollack were agents of Stax, their statements are not hearsay, but rather admissions under Fed.R.Evid. 801(d)(2). They argue that the adversary principle embedded in rule 801(d)(2) means that the trustee in bankruptcy, as successor in interest, is bound by the statements of the agents of Stax. We disagree. In a suit alleging fraud by Bell and other Stax employees against Stax’s creditors, those creditors should not be bound by the agents’ statements. Rule 801(d)(2) does not include statements by predecessors in interest among the types of statements the rule makes admissible. As one commentator has pointed out, the rule
 

 rejects privity as a ground of admissibility by making no provision for it. Under the common law rule ... declarations by
 
 *1163
 
 a predecessor in title offered against a successor were often admitted. Morgan objected strenuously to this result, arguing that there is no “magic” in privity and pointing out that acceptance of the privity principle leads to dubious distinctions, particularly in bankruptcies ....
 

 4
 
 Weinstein’s Evidence
 
 801-165 (1979) (citations omitted).
 

 B. Instructions
 

 Defendants argue that the district court erred in refusing to instruct the jury that an oral agreement “may be validated at any time between the parties to the agreement,” and, “[o]nce validated, ... is good from the beginning.” This requested instruction is confusing. Its meaning is unclear because we are not told what it means to “validate” an oral agreement. The court was correct to reject the instruction for that reason. Moreover, questions concerning the existence of an oral contract between Baylor and Stax that would bind the insolvent corporation become relevant under Tennessee fraudulent conveyance law only in the consideration of the issue of constructive fraud. Because the jury found actual fraud, it did not need to reach that issue, and the court did not commit reversible error in not instructing the jury or in framing its interrogatories to them in a form that did not require them to reach it.
 

 Defendants also argue that the district court should have instructed the jury that proof of fraud must be “unequivocal and convincing.” The jury was instructed properly that Tennessee law requires proof by only a preponderance of the evidence.
 
 James
 
 v.
 
 Joseph,
 
 156 Tenn. 417, 424, 1 S.W.2d 1017 (1928).
 

 Defendants’ third claim of error in the jury instructions is the court’s “absent witness” instruction. Defendants concede that the substance of the instruction was proper but argue that particular absent witnesses should have been identified by name. They did not raise that objection at trial, and the omission does not constitute reversible error.
 

 Defendants argue finally that the trial court erred in admitting evidence of Baylor’s prior conviction of a felony and in instructing the jury that the fact of the conviction was relevant to his credibility. Fed.R.Evid. 609(a) states that such convictions are admissible if,
 
 inter alia,
 
 the crime was punishable by imprisonment of more than a year and its probative value outweighs its prejudicial effect. Defendants concede that the first condition is met, and the trial court did not abuse its discretion in ruling as it did on the second. Baylor’s credibility was the central issue of the trial. Because the felony occurred while Baylor was travelling on behalf of Stax, it is particularly relevant to defendants’ contention that Baylor was doing more than selling records; he was also “representing the company” (Tr. 1196).
 

 Accordingly, the judgment of the district court is affirmed.
 

 [1]
 

 . The payments that plaintiff seeks to recover from Baylor are represented by four checks:
 

 The IRS seized the first check from Baylor for back taxes; the second and fourth checks were sent directly to it. Altogether, the IRS was sent about $1,850,000. The IRS later returned to Baylor a little over $600,000.
 

 [2]
 

 . T.C.A. § 64-315 states:
 

 Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors, is fraudulent as to both present and future creditors.
 

 [3]
 

 . Returns are records returned to record companies such as Stax because not sold; free goods are records distributed as promotional devices. Record companies receive no direct income from either.