849 F.2d 610
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re Ike SLODOV, Debtor.
Lewis A. ZIPKIN, Plaintiff-Appellant,
v.
Ike SLODOV, Defendant-Appellee.
 No. 87-3591.
 United States Court of Appeals, Sixth Circuit.
 June 20, 1988.
 
 Before NATHANIEL R. JONES, MILBURN and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Lewis Zipkin, former trustee of Ike Slodov's estate, appeals the district court's decision affirming the bankruptcy court's denial of fees in connection with Zipkin's work as trustee of the Slodov estate. For the reasons discussed below, we affirm.
 
 
 2
 * On November 19, 1980, Mark Schlachet, United States Bankruptcy Judge for the Northern District of Ohio, appointed Zipkin to be the trustee of the estate of Ike Slodov, the debtor. The order provided that Zipkin would be compensated in accordance with Bankruptcy Rule 12-28, pursuant to section 491 of the Bankruptcy Act of 1898, as amended. 11 U.S.C. Sec. 1 et seq. A second order entered on December 4, 1980, again appointed Zipkin as trustee and fixed his bond at $5,000.
 
 
 3
 On February 4, 1981, the bankruptcy court authorized Zipkin, as trustee, to operate the businesses of the debtor, except for his dental practice. A later order specifically empowered the trustee to operate and manage the debtor's rental property, including the Early Village Apartments.
 
 
 4
 Zipkin acted as trustee until his resignation in September 1982. He had previously been awarded fees of $22,821 and $10,176 by Judge Schlachet, for a total of $32,997. On September 10, 1982, Zipkin filed a third and final application for fees and expenses as trustee. He requested an additional $88,338.07. Debtor Slodov opposed the request, and asked the court to order Zipkin to return the fees already awarded. Slodov argued that Zipkin was negligent in his administration of the estate. He also alleged that Zipkin had improper connections to Bankruptcy Judge Schlachet, and thus his appointment as trustee violated Bankruptcy Rule 505(a)(2).
 
 
 5
 A hearing was held before Bankruptcy Judge H.F. White. Agreeing with the debtor, the bankruptcy court denied Zipkin's final fee request for $88,338.07, and entered judgment against him for $32,997 in fees already awarded. In re Slodov, 28 Bankr. 698 (Bankr.N.D.Ohio 1983). The district court affirmed the bankruptcy court's order.
 
 II
 
 6
 The bankruptcy court concluded that it was improper for Judge Schlachet to appoint Zipkin as trustee under Bankruptcy Rule 505(a)(2), which reads as follows:
 
 
 7
 (a) Appointment or Employment of Relative of or Person Connected with Judge or Referee. No person may be appointed as trustee, receiver, marshall, or appraiser or employed as accountant or auctioneer in a bankruptcy case ... (2) if he is so connected with any judge or referee of the court making the appointment or authorizing the employment as to render such appointment or employment improper.
 
 
 8
 According to the bankruptcy court, Zipkin was the personal attorney for Judge Schlachet and his wife and had represented them in various lawsuits both prior to and during the period of the trusteeship. For example, Zipkin filed a lawsuit in February 1978 against Volvo of America Corporation, alleging defects in a Volvo automobile purchased by Mrs. Schlachet. Zipkin's representation in this suit continued during the Slodov trusteeship, as evidenced by a May 20, 1981, letter from Zipkin to the state court requesting an indefinite suspension of the proceedings. Schlachet had also been a member of Zipkin's law firm before his appointment as a bankruptcy judge, and the two men had participated in and shared fees from a class action lawsuit. The bankruptcy court noted that Judge Schlachet did not receive his fees from the case until after he was appointed to the bench.
 
 
 9
 The bankruptcy court also concluded that Zipkin in many respects "was negligent in his management of the Slodov estate" and, "rather than attempting to minimize expenses to the estate through his trusteeship[,] he substantially increased expenses and thereby failed to conserve the estate's assets." 28 Bankr. at 703.
 
 
 10
 The court found that Zipkin was negligent in his management of the Early Village Apartments. In particular, he failed to correct expeditiously the serious drainage problem in the roof of Building C, causing the apartments below to become flooded and damaged. According to the court, Zipkin first noticed this problem shortly after he became trustee in January 1981, but did not repair the roof until the Spring of 1982. The damage forced Building C to be closed during the winter months of 1981-82, which reduced the rents coming into the estate for that period.
 
 
 11
 The bankruptcy court rejected the trustee's claim that funds were not available earlier than Spring 1982 to make repairs. The court noted that Zipkin failed to make current interest payments on a mortgage loan, and did not pay real estate taxes as they fell due, despite the fact that the debtor was able to do so during his possession of the estate. The court concluded: "Thus, it would appear that the monies which otherwise would have been used to make mortgage and tax payments could have been used to repair the roof." Id. at 703.
 
 
 12
 Additionally, the bankruptcy court found that Zipkin was negligent in failing to replace the boiler in Building C until after the winter months of 1981-82. Because of this, the building went unheated and the pipes froze. Eventually, the pipes burst, causing additional water to flood the apartments. According to the court, Zipkin failed to have the boiler promptly replaced, despite the bankruptcy court's authorization to execute a Certificate of Indebtedness for the specific purpose of securing funds to have the boiler work done. Ibid.
 
 
 13
 With respect to Zipkin's failure to conserve the estate's assets, the court concluded that the trustee "incurred excessive expenses on behalf of the estate, primarily for the payment of compensation to himself and members of his law office staff." Ibid. Zipkin hired Phyllis Watkins, a former paralegal in his law office, to work as manager of the Apartments, and requested payment for her services "on the basis that 100 percent of her employment" was spent at the Apartments. Ibid. The court found, however, that Watkins was "physically incapable of working a full-time job for Early Village [Apartments]." Ibid. In addition to her managerial services, she ran a cosmetics corporation know as Phyllis Watkins, Inc. and was a full-time student at Case Western Reserve University.
 
 
 14
 The court also found that an excessive amount of Zipkin's fee request for his own time ($39,250) represented time spent conferring with Watkins: "Indeed, a rough tally done ... shows that no less than 41 percent of the time for which Zipkin seeks compensation on his final application and perhaps as much as 51 percent of that time was spent conferring with Ms. Watkins." Ibid. The court concluded that Zipkin's employment of Watkins "did no more than place an extra unnecessary layer of management into the operation" of the Apartments. Ibid. Further, the court found that Zipkin paid attorney's fees to Alan Goodman without court approval. Goodman is a member of Zipkin's law firm and did eviction work for the estate.
 
 
 15
 Having found that Zipkin was negligent in his operation of the Early Village Apartments, that he failed to conserve the assets of the estate, and that his appointment as trustee by Judge Schlachet was improper, the bankruptcy court determined that Zipkin was not entitled to any fees for his work as trustee of the Slodov estate. In reaching this conclusion, the court relied on section 48e of the Bankruptcy Act of 1898, as amended, 11 U.S.C. Sec. 76e:
 
 
 16
 Withholding Compensation. -- The court may, in its discretion, withhold all compensation from any receiver, trustee, attorney, or any other person who has been removed from office or dismissed because of the unlawful sharing of fees or for any other cause." (emphasis added)
 
 
 17
 Viewing the trusteeship in its entirety, the bankruptcy court ruled that Zipkin should be denied fees "for any other cause," notwithstanding the fact that the trustee was not removed from the case, but instead resigned. 28 Bankr. at 706 (citing In Re Endeco, Inc., 675 F.2d 166 (8th Cir.1982)). The court concluded:
 
 
 18
 Having accepted the improper appointment, Zipkin was bound to exercise diligence in his adminsitration of the estate so as to conserve the assets of the estate. Indeed, Zipkin could have minimized, to an extent, the effect of his improper appointment through a diligent and effective operation of the estate. Instead, as was shown at the hearing, there has been a serious decrease in income to the estate from the real estate holdings during Zipkin's trusteeship. It was also shown that Zipkin's substantial delay in replacing the boiler in Building C of the Early Village Complex resulted in that building being uninhabitable during the Winter months of 1981. Additionally, Zipkin has requested payment of fees and expenses in this estate in an amount totalling 45 percent of the income generated through the holdings. This excessive request has been made despite Zipkin's statement at the hearings that he felt a 25 percent management fee was reasonable.
 
 
 19
 The Court finds that there has been some benefit to the estate through the trusteeship. Despite this benefit, the Court concludes that fees must be withheld herein. To do otherwise would encourage future appointments such as that of Zipkin's and would serve to heighten public disrespect for the judicial branch and lawyers in general. In withholding fees, this Court makes special note of the fact that the problem herein could have been lessened also through a careful, cost-efficient, and diligent management of the real estate holdings, something which did not occur in this case.
 
 
 20
 28 Bankr. at 707 (citation omitted).
 
 III
 
 21
 Initially, Zipkin argues that the bankruptcy court erroneously relied on Bankruptcy Rule 505(a)(2), in determining that his appointment as trustee was improper. He contends that Rule 505(a) imposes a duty on the bankruptcy judge, not on the trustee, to police the appointment. Otherwise, he says, there would be a great disincentive to accept such appointments: "[C]apable persons would not accept trusteeships for fear that their services would go uncompensated because of an error in their evaluation of any connections with the appointing judge."
 
 
 22
 Zipkin also asserts that Judge Schlachet balanced the connection he had with the prospective trustee with Zipkin's qualifications in the field of real estate development in determining that his appointment as trustee would be beneficial to the estate. Further, the debtor knew of the trustee's connections with Judge Schlachet at the time of Zipkin's appointment, but failed to protest until the final fee application in September 1982. Without a timely challenge, Zipkin argues, the debtor has waived any right to protest the propriety of the appointment.
 
 
 23
 The language of Bankruptcy Rule 505(a) supports Zipkin's contention that the Rule imposes a duty on the appointing judge, rather than on the prospective trustee. On the other hand, we would find it anomalous if a trustee did not have a duty to refuse an appointment, even when offered to him, which he knew was improper and thus transgressed the Rule. We need not decide this interesting question, however. Even assuming the bankruptcy court erred in relying on Rule 505(a), as Zipkin contends, we conclude that the denial of fees may be upheld on the court's finding that Zipkin negligently managed the Early Village Apartments and failed to conserve the assets of the Slodov estate. See Russ' Kwik Car Wash v. Marathon Petroleum Co., 772 F.2d 214, 216 (6th Cir.1985) (an appellate court can affirm a lower court ruling on a basis that finds support in the record).
 
 IV
 
 24
 A bankruptcy court has authority pursuant to section 48e of the Bankrupcty Act of 1898, as amended, 11 U.S.C. Sec. 76e, to withhold compensation, where the trustee has misused the bankrupt's assets or negligently managed the estate. In re Endeco, Inc., 675 F.2d 166, 167 (8th Cir.1982). See Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 461 (6th Cir.1982) (and cases cited therein); Carson, Pirie, Scott & Co. v. Turner, 61 F.2d 693 (6th Cir.1932); In re Perelstine, 44 F.2d 62 (W.D.Pa.1930), aff'd sub nom. Royal Indemnity Co. v. Sproul, 46 F.2d 1019 (3d Cir.1931); In re Stillwell, 12 F.2d 205 (6th Cir.1926); In re Schoenfeld, 183 F. 219 (3d Cir.1910). Accord, In re Derryberry, 72 Bankr. 874, 878 (Bankr.N.D.Ohio 1987) (same principles apply under current bankruptcy code). The court also has the authority to order the trustee to refund amounts already paid. Endeco, 675 F.2d at 168.
 
 
 25
 Both parties agree that Zipkin should be held to the standard of care set forth in Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 461-62 (6th Cir.1982). A bankruptcy trustee is liable in his official capacity for acts of negligence. Id. at 461 (and cases cited therein).
 
 
 26
 The applicable standard is the exercise of due care, diligence and skill both as to affirmative and negative duties. The measure of care, diligence and skill required of a trustee is that of "an ordinary prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view." Mistakes in judgment cannot be the basis of a trustee's liability in his official capacity.
 
 Ibid. (citations omitted).[1]
 
 27
 The standard of review for the bankruptcy court's decision is quite limited. The court's findings of fact are binding on the district court and this court unless clearly erroneous. Southwestern Media, Inc. v. Rau, 708 F.2d 419, 422 (9th Cir.1983); Endeco, 675 F.2d at 168. Moreover, the bankruptcy court's decision denying compensation to a trustee will not be disturbed, unless the court has abused its discretion or erroneously applied the law. Southwestern Media, 708 F.2d at 422; Endeco, 675 F.2d at 168; In re Johnson, 518 F.2d 246, 256 (10th Cir.), cert. denied sub nom. Clark v. Johnson, 423 U.S. 893 (1975).
 
 
 28
 Zipkin contends the bankruptcy court erred in concluding that he was negligent in managing the Early Village Apartments, and that he failed to preserve the estate's assets. Addressing the court's contention that Phyllis Watkins could not perform her managerial duties because of other commitments, Zipkin points to Watkins's testimony that she often worked at the Early Village Apartments early in the morning, late in the evening, and on weekends. He also asserts that Watkins's performance was so commendable that the debtor offered her a job after Zipkin resigned as trustee.
 
 
 29
 With respect to building repairs, Zipkin argues that all of the bids he received for Building C's roof before April 1982 failed to deal with the drainage problem and, in any event, the rental proceeds could not cover this additional repair expenditure. He also contends that he replaced the old boiler with a new one in December 1981, but the second boiler failed due to corroded underground intake pipes which allowed sand to enter the boiler. He shut the boiler down and ordered the water in the building be turned off. However, the inferior drainage system collected water, instead of draining it. When the building went without heat, the pipes froze and burst, spreading water throughout the apartments.
 
 
 30
 Zipkin also asserts that there were insufficient funds to make all the repairs as soon as possible. When the Certificate of Indebtedness was approved, the court order approving it was appealed, thereby delaying receipt of the funds until March 1982. He points out that the repairs to Building C were substantially completed by August 1982. Finally, he contends that he implemented a new rental policy, under which undesirable tenants were ask to leave when their leases expired and credit checks were instituted for prospective tenants.
 
 
 31
 In short, Zipkin contends that he transformed the Early Village Apartments from "a near slum-like condition" to a "community asset" by the time he resigned as trustee. Even assuming some of his decisions, in hindsight, may have been faulty, Zipkin asserts, he merely made mistakes in judgment for which he should not be liable.
 
 
 32
 We have carefully reviewed the entire record. While Zipkin's interpretation finds some support in the record, we cannot say the bankruptcy court's findings of fact are clearly erroneous. The court heard the evidence and observed the witnesses, and thus was entitled to draw inferences therefrom.
 
 
 33
 Without reiterating all the pertinent evidence in the record, we note that Zipkin admitted learning about the roof problems in Building C at the beginning of the trusteeship. Yet, he did not repair the problem until after the disastrous winter months of 1981-82, despite receiving construction bids for the job in early 1981. Although Zipkin claims there were insufficient funds to make the necessary repairs, he admitted never making interest payments on a mortgage loan, nor did he pay real estate taxes, despite the estate's ability to do so under the debtor. From this evidence, the bankruptcy court could properly conclude that funds were indeed available before Winter 1981-82 to fix the roof in Building C.
 
 
 34
 Steve Roth, Chief Building Inspector for the City of Mentor, testified that although roof repairs should normally be made in warm weather, they should be done immediately in emergency situations. In his view, the roof was the most serious problem in Building C, which could result in condemnation if unrepaired. Yet, the trustee did not repair the roof until the Spring of 1982. On the basis of this testimony, the bankruptcy court was entitled to find that Zipkin was negligent in failing to repair the roof before the winter months of 1981-82. There is also little question about the terrible condition of Building C following those winter months. The debtor, who had occasion to visit Building C in 1982, observed "mildew all over the walls, the ceilings were falling down, there was water running through between the first floor all the way to the second floor."
 
 
 35
 Despite Zipkin's claim that the Early Village Apartments was transformed into a "community asset" as a result of his trusteeship, there was testimony to the contrary on which the bankruptcy court could rely. Stan Leffe of Stanmor Realty, which now manages the Early Village Apartments, testified that the apartments were in "poor condition." He also asserted that Building C was "uninhabitable" at least until "emergency" measures were taken, which he described in significant detail. Nick Davirro, an employee of Early Village Apartments, observed that the roof was still holding an excessive amount of water, which was caused by an improper drainage system.
 
 
 36
 The record also supports the bankruptcy court's conclusion that Watkins was physically incapable of working a full-time job at the apartments. Watkins admitted carrying 9 to 12 hours of courses at Case Western Reserve University, and being an employee of Phyllis Watkins, Inc., a cosmetics firm. Indeed, Zipkin acknowledged an agreement to pay the corporation for Watkins's services to the estate. Moreover, Caryl Cohen, a former employee who worked a nine-to five shift at the Early Village Apartments, testified that she saw Watkins at the Apartments only a few hours per week, which decreased when the latter went to school. Although Watkins asserted that she worked at nights and on weekends for the estate, the court was entitled to disbelieve her testimony. As for the lower court's claim that Zipkin spent an excessive amount of time conferring with Watkins, the trustee's fee applications support this conclusion.
 
 
 37
 In short, the bankruptcy court was entitled to conclude on this record that Zipkin was negligent in managing the Early Village Apartments and failed to conserve the assets of the estate. Even if we were not wholly confident of the lower court's conclusions, the clearly erroneous standard would not permit this court to reverse the trier of fact merely because we would have read the evidence differently. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). Viewing the record in its entirety, we cannot say with definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Accordingly, we conclude that the bankruptcy court did not abuse its discretion in denying Zipkin any fees for his work as trustee of the Slodov estate.
 
 V
 
 38
 As a final matter, Zipkin contends that the bankruptcy court erred in allowing the debtor to question Zipkin, during cross examination, about his criminal conviction for embezzlement, 18 U.S.C. Sec. 153, which allegedly occurred while he was trustee of another debtor's estate. Zipkin's conviction occurred on October 18, 1982, during the hearings before Judge White, but was subsequently reversed on appeal. United States v. Zipkin, 729 F.2d 384 (6th Cir.1984). He has not been retried. Relying on Rule 404(b), Fed.R.Evid., Zipkin argues that the conviction was introduced to show he was of bad character. This was prejudicial and improper, he says, especially since the conviction was being appealed.
 
 
 39
 Zipkin's argument is without merit. His conviction was admissible to attack his credibility pursuant to Rule 609(a)(2), Fed.R.Evid., which reads as follows:
 
 
 40
 (a) General Rule--For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime ... (2) involved dishonesty or false statement, regardless of the punishment.
 
 
 41
 The embezzlement conviction is clearly admissible as a crime involving "dishonesty or false statement." Petty v. Ideco, Division of Dresser Industries, Inc., 761 F.2d 1146, 1152 (5th Cir.1985) (relying on H.R.Conf.Rep. No. 1597, 93d Cong., 2d Sess. 9, reprinted in 1974 U.S. Code.Cong. & Admin.News 7098, 7103). See also Murr v. Stinson, 752 F.2d 233, 235 (6th Cir.1985); Calhoun v. Baylor, 646 F.2d 1158, 1163 (6th Cir.1981).
 
 
 42
 Zipkin's credibility was an important factor in this case, and the bankruptcy court could properly consider the embezzlement conviction. That Zipkin was appealing the conviction during the pendency of the hearings before Judge White is not significant. Rule 609(e) specifically provides that "[t]he pendency of an appeal ... does not render evidence of a conviction inadmissible." Accord, United States v. Klayer, 707 F.2d 892 (6th Cir.), cert denied, 464 U.S. 858 (1983). Zipkin could have sought to ameliorate the impact of the conviction by offering evidence of the pendency of the appeal. Rule 609(e), Fed.R.Evid.
 
 
 43
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 A bankruptcy trustee may also be personally liable for acts willfully and deliberately in violation of his fiduciary duties. Weaver, 680 F.2d at 461