RECOMMENDED FOR PUBLICATION
*File Name: 24b0001p.06*

# BANKRUPTCY APPELLATE PANEL

## OF THE SIXTH CIRCUIT

IN RE: INSIGHT TERMINAL SOLUTIONS, LLC

> *Debtor*.

INSIGHT TERMINAL SOLUTIONS, LLC,

> *Plaintiff-Appellant*,

*v.*

CECELIA FINANCIAL MANAGEMENT, LLC; OASIS AVIATION LLC; HALAS ENERGY, LLC; JOHN J. SIEGEL, JR.,

> *Defendants*,

BAY BRIDGE EXPORTS, LLC,

> *Intervening Defendant-Appellee*.

No. 23-8004

Appeal from the United States Bankruptcy Court
for the Western District of Kentucky at Louisville.
Nos. 19-bk-32231; 21-ap-03013—Joan A. Lloyd, Bankruptcy Judge.

Argued: November 7, 2023

Decided and Filed: February 28, 2024

Before: CROOM, DALES, and GUSTAFSON, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

**ARGUED:** Michael A. Kaplan, LOWENSTEIN SANDLER LLP, New York, New York, for Appellant. Roger G. Jones, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael A. Kaplan, Robert M. Hirsh, Rasmeet K. Chahil, LOWENSTEIN SANDLER LLP, New York, New York, for Appellant. Roger G. Jones, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee.

—————————————

**OPINION**

—————————————

SCOTT W. DALES, Bankruptcy Appellate Panel Judge.   Had the principal witness in this matter survived his deposition long enough to submit to cross-examination, the adversary proceeding to disallow or recharacterize the claim at issue may have turned out differently.   The key witness, however, did not survive long enough to complete his direct examination, let alone submit to cross-examination.   So, in an unremarkable exercise of its discretion under the rules, the Bankruptcy Court declined to admit his incomplete testimony.   Such are the risks of litigation.

Consequently, after trial in the underlying adversary proceeding, the Bankruptcy Court entered judgment allowing Proof of Claim No. 1 originally filed by Cecelia Financial Management, LLC (the "Claim") over the objection of chapter 11 debtor-in-possession Insight Terminal Solutions, LLC ("ITS").   The court found that ITS failed to rebut the presumption of validity and amount of the Claim that arose under Bankruptcy Rule 3001(f), rejecting ITS's effort to disallow the Claim (1) for want of consideration, or (2) as a disguised equity contribution.[1]   ITS appealed from the judgment and, finding no reversible error, we AFFIRM.

**ISSUES ON APPEAL**

Though ITS listed twenty-two assignments of error in its Statement of Issues on Appeal, the dispute distills into three main questions:  (1) whether the Bankruptcy Court erred in refusing to admit the incomplete deposition testimony of John J. Siegel, Jr.; (2) whether, in overruling ITS's challenge to the Claim, the Bankruptcy Court properly applied Bankruptcy Rule 3001(f)'s presumption; and (3) whether the Bankruptcy Court properly refused to recharacterize the Claim as equity.

---

[1]The appeal involves numerous federal rules of procedure and evidence. The Panel will refer to each rule simply as "Bankruptcy Rule __," "Civil Rule ___," or "Evidence Rule____".

**JURISDICTION**

The Panel has jurisdiction to hear appeals "from final judgments, orders, and decrees" issued by a bankruptcy court within a participating district. 28 U.S.C. § 158(a)(1). "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. __, 140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501, 135 S. Ct. 1686, 1692 (2015)). Historically, in a Bankruptcy Rule 3007 contested matter, "[a]n order allowing or disallowing a claim is a final order." *In re Tench*, No. 15-8026, 2016 WL 2892497, at *1 (B.A.P. 6th Cir. May 11, 2016) (citations omitted). Here, ITS has challenged the allowance of the Claim by filing an adversary complaint. The order on appeal resolved the adversary proceeding (the judicial unit in jurisdiction parlance) and allowed the Claim in full. Accordingly, the order is final and appealable as of right.

**FACTS[2]**

A brief description of the corporate structure and relationships of the debtor-in-possession, ITS, and its original creditor, Cecelia Financial Management, LLC ("Cecelia"), is the starting point to understanding this appeal, given the pre-bankruptcy roles that John J. Siegel, Jr., and his family members played in both entities. ITS is a Delaware limited liability company with its principal place of business in Louisville, Kentucky. John J. Siegel, Jr., was the non-member manager of ITS from its formation on October 19, 2017, until November 5, 2020, the effective date of the chapter 11 plan in this case. ITS's sole member was Insight Terminal Holdings, LLC ("ITH"). Mr. Siegel's wife was the sole member of ITH. Additionally, two adult children of Mr. and Mrs. Siegel owned Cecelia, either directly or indirectly. Mr. Siegel was also the non-member manager of Cecelia. This network of family and other relationships clearly excited concern about the bona fides of the Claim that Cecelia filed in ITS's bankruptcy case (seeking $5,680,244.48 in principal and $283,198.00 in interest).

---

[2]The parties filed a stipulation of facts prior to the trial, referred to herein as the "Stipulation." (Adv. P. 21-03013, ECF No. 106.).

ITS filed a voluntary chapter 11 bankruptcy petition on July 17, 2019, and Cecelia timely filed its Claim. After the Bankruptcy Court confirmed a chapter 11 plan, ITS filed an adversary proceeding against Cecelia, Mr. Siegel, Halas Energy, LLC ("Halas"), and Oasis Aviation, LLC ("Oasis") to disallow or reduce the proofs of claim filed by Cecelia, Halas, and Oasis, to recharacterize as equity or equitably subordinate the supposed indebtedness, and to hold Mr. Siegel liable for fraud. Because Bay Bridge Exports, LLC ("Bay Bridge") held a security interest in the Claim, the Bankruptcy Court permitted Bay Bridge to intervene as a defendant. (Adv. P. 21-03013, ECF Nos. 20–21.) At trial and now on appeal, Bay Bridge, rather than Cecelia, pulled the laboring oar in defending the Claim it now holds.

Before trial, the parties stipulated to reduce the Claim and dismiss several counts, including the fraud claim against Mr. Siegel. (Adv. P. 21-03013, ECF No. 34.) Also, before trial, the Bankruptcy Court granted ITS's motion for summary judgment disallowing the Halas and Oasis claims after those entities failed to respond to the motion. (Adv. P. 21-03013, ECF No. 63.) Having cleared away the brush, the Bankruptcy Court proceeded to try the remaining issues, principally (1) whether the Claim should be disallowed or further reduced under Kentucky law and 11 U.S.C. § 502(b)(1); and (2) whether the Claim should be recharacterized as equity, given the close-knit relationships just described, as well as the terms and history of the advances reflected in the Claim.

Shortly before trial, Cecelia formally assigned the Claim to Bay Bridge under Bankruptcy Rule 3001(e)(2), presumably reflecting Bay Bridge's enforcement of its security interest in the Claim. (Bankr. Case 19-32231, ECF No. 442.) Evidently prompted by the foreclosure of Bay Bridge's security interest, Cecelia and the Clerk gave notice of Cecelia's transfer of the Claim to Bay Bridge. Without objection, Bay Bridge was "substituted for the transferor"—Cecelia—under Bankruptcy Rule 3001(e)(2). Cecelia did not attend the trial, though it technically remained a party to the adversary proceeding challenging its former Claim.

The Claim is based on the following promissory notes issued by ITS and its predecessor in interest, TLS Holdings, LLC, dba Terminal Logistics Solutions, LLC ("TLS"), to Cecelia and its predecessor in interest, Bowie Resource Partners, LLC ("Bowie"):

1. Promissory Note and Guarantee dated March 3, 2017, issued by TLS, as borrower, and Cedars Energy, LLC ("Cedars"), as guarantor, in favor of Bowie (the "Original TLS Note");

2. First Amended Promissory Note dated October 23, 2017, issued by TLS, as borrower, in favor of Cecelia in the principal amount of $1,942,467.15 (the "First Amended TLS Note", and together with the Original TLS Note, collectively, the "TLS Notes");

3. Second Amended Promissory Note dated May 30, 2019, issued by ITS, as borrower, in favor of Cecelia in the principal amount of $5,436,444.48 (the "Second Amended ITS Note");

4. Third Amended Promissory Note dated July 15, 2019, issued by ITS, as borrower, in favor of Cecelia in the principal amount of $5,680,244.48 (the "Third Amended ITS Note", and together with the Second Amended ITS Note, collectively, the "ITS Notes", and the ITS Notes together with the TLS Notes, the "Notes"); and

5. Fourth Amended Promissory Note dated October 31, 2019, issued by ITS, as borrower, in favor of Cecelia in the principal amount of $5,769,568.98 (the "Fourth Amended ITS Note.")

(*See* Stipulation at ¶¶ 11–14, Adv. P. 21-0313, ECF No. 106).

The Stipulation identifies the parties involved and summarizes the chronology of the advances, tracing the documentation of obligations from TLS (as original obligor) to ITS (as successor obligor) under the more recent amendments of the promissory notes. As the advances evidenced by the Original TLS Note mounted, the transacting parties amended and restated the Original TLS Note four separate times. Significantly, ITS (as borrower) issued the Second, Third, and Fourth Amended Promissory Notes. (*Id.* at ¶¶ 14–15.)

The primary asset of ITS (and before that, TLS) was the right to negotiate a sublease and operating agreement for the Bulk Oversized Terminal in the City of Oakland. TLS and later ITS used the advances reflected in the TLS Notes and ITS Notes to acquire the sublease rights and exercise options to continue those rights. "From [October 19, 2017, until November 5, 2020], ITS generated no operating revenues." (*Id.* at ¶ 20.)

"From [ITS's] Formation Date to ITS's bankruptcy filing, funds were advanced to ITS through the ITS Notes, which were the basis for the Cecelia Claim." (*Id.* at ¶ 22.) "Cecelia never recorded a lien or security interest in ITS's assets." (*Id.* at ¶ 23.) ITS's initial list of

20 Largest Unsecured Claims did not include Cecelia. (*Id.* at ¶ 26.) In Schedule E/F, filed on August 14, 2019, ITS listed Cecelia as having a contingent, unliquidated, and disputed unsecured claim in the amount $5,680,244 for debt incurred on May 30, 2019. (*Id.* at ¶ 27.)

On January 20 and 21, 2022, ITS commenced (and continued) a deposition of Mr. Siegel. All parties were aware that, at the time of the deposition, Mr. Siegel was suffering from cancer in an advanced stage. Before ITS could even complete its direct examination, Mr. Siegel rather abruptly requested another adjournment, indicating that the examination "was a lot of hours for me, to be honest, given the last few months." (Jan. 21, 2022 Dep. Tr. at 165:24–25, Adv. P. 21-03013, ECF No. 70.) The parties graciously adjourned the deposition to accommodate his dire condition, but because Mr. Siegel succumbed to cancer in early April 2022 without resuming his deposition, ITS did not complete its direct examination of Mr. Siegel and the defendants did not cross examine him.

On August 30, 2022, ITS filed a designation of the portions of Mr. Siegel's deposition it intended to offer at trial. That same day, Bay Bridge filed a motion in limine to exclude the deposition testimony. The Bankruptcy Court denied the motion, in part, and accepted Siegel's deposition testimony as a proffer to be addressed at trial. (Sept. 19, 2022 Order, Adv. P. 21-03013, ECF No. 115.)

At trial, ITS's only witness, Ms. Lisa Jarrett, confirmed that Cecelia and its related entities made various advances to TLS and that those advances were included in the Schedule A attached to each TLS Note. (Sept. 13, 2022 Hr'g Tr., 76:25–95:14, Adv. P. 21-03013, ECF No. 117.) Ms. Jarrett also testified that she was involved in preparing the Schedule A attached to each ITS Note, which were cumulative and included the prior advances made to TLS, and that she had "back up to all the numbers" included on each Schedule A. (*Id.* at 65:21–66:13.)

Ms. Jarrett further testified that Cecelia and the related entities accounted for the advances they made to ITS and the related entities as transfers from the related entities to Cecelia, and loans from Cecelia to ITS. (*Id.* at 77–115.) As noted above, ITS also stipulated that, from October 19, 2017, to ITS's bankruptcy filing, "funds were advanced to ITS through

the ITS Notes, which were the basis for the Cecelia Claim." (Stipulation at ¶ 22, Adv. P. 21-0313, ECF No. 106)

The Bankruptcy Court entered its Findings of Fact and Conclusions of Law ("Opinion") on January 11, 2023, ruling that the Claim enjoyed the presumption of validity under Bankruptcy Rule 3001(f), and that ITS had not offered sufficient evidence to rebut the presumption. (Adv. P. 21-03013, ECF No. 125.) The court also found that the promissory notes were enforceable under Kentucky Law and that ITS had assumed the TLS Notes. Finally, the Bankruptcy Court found no basis for recharacterizing the claim as equity—addressing both the applicability of the recharacterization factors to a non-insider holder of a claim, and the factors governing recharacterization as set forth in *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.),* 269 F.3d 726, 747–53 (6th Cir. 2001). Accordingly, the Bankruptcy Court entered judgment for Bay Bridge, in effect overruling ITS's objection to the Claim.

ITS timely filed this appeal.

## DISCUSSION

### I.  Exclusion of Mr. Siegel's Incomplete Deposition Testimony

ITS's challenge to the Bankruptcy Court's ultimate decision to allow the Claim in full and without recharacterizing it as equity relies in large measure on Mr. Siegel's deposition testimony. ITS asserts that the Bankruptcy Court erred in its assessment of Mr. Siegel's testimony. As the evidence shows, Mr. Siegel served on both sides of the transactions involving ITS and Cecelia, through whom Bay Bridge derived its rights in the Claim. The Panel, therefore, turns first to this crucial evidentiary issue.

ITS argues the Bankruptcy Court hobbled its presentation of evidence principally by making two purportedly erroneous rulings—the first regarding motions to quash two subpoenas, and the second by excluding the incomplete deposition testimony of Mr. Siegel under Civil Rule 32 (made applicable here by Bankruptcy Rule 7032) and various rules of evidence. The Panel finds the first issue waived, and the second without merit.

Regarding the motions to quash, ITS failed to include in the record on appeal the transcript of the hearing upon which it relies in its challenge to the Bankruptcy Court's decision to quash the two subpoenas. The Panel regards the argument as insufficiently supported and therefore waived.**3**

Regarding the exclusion of Mr. Siegel's testimony under Civil Rule 32, ITS fares no better. Rule 32(a) provides in relevant part as follows:

> (1) *In General.* At a hearing or trial, all or part of a deposition may be used against a party on these conditions:
>
>> (A)   the party was present or represented at the taking of the deposition or had reasonable notice of it;
>>
>> (B)   it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
>>
>> (C)   the use is allowed by Rule 32(a)(2) through (8).

Fed. R. Civ. P. 32(a)(1). Under Rule 32(a)(4)(A), "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds that the witness is dead." Here, there is no dispute that Mr. Siegel passed away and that Bay Bridge was present at the deposition. There is also no dispute that ITS did not complete the deposition or tender the witness for cross-examination. The inquiry, however, does not end there.

The Bankruptcy Court excluded Mr. Siegel's testimony because "ITS never completed its direct examination of Mr. Siegel, and neither Bay Bridge nor Cecelia had any opportunity to cross-examine Mr. Siegel." (Op. at ¶ 22, Adv. P. 21-03013, ECF No. 125.) The Bankruptcy Court elaborated, exaggerating somewhat: "Courts have uniformly held that Rule 32(a)(1) requires that the party opposing admission of the statement have had a reasonable opportunity to

---

**3**ITS argues the Bankruptcy Court erred by granting two motions to quash subpoenas, asserting the court failed to conduct the required analysis to "'weigh the relevance of the requested material against the burden of producing the material,'" or afford an opportunity to respond to Bay Bridge's arguments. (Appellant Br. at 15 (quoting *Schnatter v. 247 Grp., LLC*, 343 F.R.D. 325, 330 (W.D. Ky. 2022) (citation omitted).). Without the transcript of the September 7, 2022, hearing on the motions, the Panel cannot evaluate the Bankruptcy Court's rulings in this regard. *See* Fed. R. Bankr. P. 8009(b)(1), (b)(5), and 8018(b)(1)(F) (appellant's duty to order and file transcripts); *Coleman v. Shoney's Inc.*, 79 F. App'x 155, 157 (6th Cir. 2003)("plaintiff's challenges to evidentiary rulings and evidence are unreviewable without a trial transcript."); *cf. McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

cross-examine the deponent." (*Id*. at ¶ 23.) ITS argues that the Bankruptcy Court misapplied the law because, in the Sixth Circuit, the requirement for cross-examination prior to the admission of deposition testimony is not absolute.

At oral argument before the Panel, however, ITS conceded that the Bankruptcy Court had discretion to exclude Mr. Siegel's deposition under Rule 32, and the Panel is hard-pressed to second-guess that exercise of discretion, especially when premised on the absence of cross-examination—the judicial touchstone of reliability. Excluding prior testimony that has not been subject to cross-examination falls well within the broad discretion trial courts have under the Federal Rules of Evidence.

Nevertheless, ITS urges the Panel to find that Evidence Rule 801(d)(2) requires admission of the incomplete testimony against Cecelia—who technically remained a party even though it did not appear at trial. The Panel rejects the argument largely for the same reasons the Bankruptcy Court did: Cecelia and Bay Bridge are distinct entities. Moreover, the Bankruptcy Court permitted Bay Bridge to intervene—a ruling not challenged on appeal—so Bay Bridge was also a party. Under the circumstances, even assuming, *arguendo*, the uncrossed testimony was admissible against Cecelia under Rule 801(d)(2), it was not thereby admissible against Bay Bridge, a distinct party. The rules clearly provide that evidence may be admissible against some but not all parties, and for some but not all purposes. Fed. R. Evid. 105. Moreover, "Rule 801(d)(2) does not include statements by predecessors in interest among the types of statements the rule makes admissible." *Calhoun v. Baylor*, 646 F.2d 1158, 1162 (6th Cir. 1981). So, the cited rule provides no basis for tagging Bay Bridge with Mr. Siegel's statements, even though Bay Bridge succeeded to Cecelia's rights under the Claim and was substituted in Cecelia's stead.[4]

ITS also contends that the Bankruptcy Court erred in not considering admission of Mr. Siegel's testimony under Evidence Rules 804 or 807, as exceptions to the court's hearsay concerns. Rule 804(b)(1)(B), governing former testimony, expressly requires as a prerequisite to admission that the opposing party have an opportunity to develop the testimony through its own

---

[4]*See* Fed. R. Bankr. P. 3001(e)(2) (transferee of claim is "substituted for the transferor" if the transferor does not object to notice of transfer).

examination of the declarant. Here, the Bankruptcy Court found as a matter of fact that ITS did not complete its examination or tender Mr. Siegel to Bay Bridge for cross-examination. Indeed, depositions typically proceed in this fashion, where the entity calling the deposition completes its examination of the witness before other parties cross-examine. The Panel finds no error in the Bankruptcy Court's preliminary ruling under Evidence Rules 104 and 804(b)(1)(B).

Finally on this score, ITS contends the Bankruptcy Court should have considered admitting Mr. Siegel's testimony under the "residual exception" for hearsay statements "supported by sufficient guarantees of trustworthiness . . . ." Fed. R. Evid. 807(a)(1). The rule requires the proponent to give advance notice of the intent to offer the statement—a requirement satisfied here—but the record on appeal does not show that ITS ever invoked the residual exception. In its brief on appeal, ITS says it raised Evidence Rule 807 at the hearing on Sept. 7, 2022,[5] but Bay Bridge contends the reference targeted not Mr. Siegel's testimony but the admission of business records in connection with the motions to quash. As previously noted, however, ITS has not favored the panel with a transcript of that hearing, and the Panel has found no reference to Evidence Rule 807 in the trial transcript. The Panel finds that ITS did not preserve any claim of error under Evidence Rule 807. *See* supra n. 3. Even without waiver, the Bankruptcy Court's opinion makes plain its concerns about the trustworthiness of the former testimony, which would be a basis for rejecting admission of the Deposition testimony under the residual exception of Evidence Rule 807(a)(1). (Op. at ¶¶ 36–40, Adv. P. 21-0313, ECF No. 125.)

To summarize, the Bankruptcy Court acted well within its broad discretion, and within the rules, in excluding the testimony that Mr. Siegel was unable to finish before he died.

## II. Bankruptcy Court's Allowance of the Claim

The Bankruptcy Court found that ITS did not rebut the presumption of validity and amount that benefits the Claim under Bankruptcy Rule 3001(f), and even if it had, Bay Bridge met its burden of proving the validity and amount of the Claim. Both decisions involve the Bankruptcy Court's evaluation of the evidence, and the Panel reviews both with considerable

---

[5]Appellant's Br. at 21.

deference, as noted above. Irrespective of whether ITS rebutted the presumption of validity, it has failed to persuade the Panel that the Bankruptcy Court erred in allowing the Claim based on the entire record. It is difficult to improve upon the Bankruptcy Court's decision allowing the Claim, and the Panel affirms the Bankruptcy Court's judgment in this regard largely for the reasons set forth in the court's Opinion, with only modest additional explanation.

At trial, and again on appeal, ITS mounted three main attacks on the Claim: (1) the promissory notes upon which Bay Bridge relies are unenforceable to the extent advances were made by Cecelia's related entities, rather than Cecelia; (2) ITS cannot be liable for advances made to TLS, originally evidenced by notes that TLS signed, because there is no writing that ITS signed evidencing its assumption of the TLS obligation under the earlier notes; and (3) ITS cannot be liable for any amount set forth on Schedule A to the TLS Notes and/or the ITS Notes for which there is not additional backup documentation.

The Bankruptcy Court properly disposed of each facet of the three-pronged challenge largely for the same reason: the ITS Notes were supported by consideration and as negotiable instruments, the consideration (which may flow to a third party) makes the notes enforceable against the issuer (ITS). Ky. Rev. Stat. § 355.3-303(1)(b). This finding disposes of the challenge based on the supposed absence of supporting documents, or the suggestion that the consideration for the ITS Notes may have flowed to another related entity because an instrument is supported by consideration if it is given "for value" and that includes being "issued or transferred as payment of, or as security for, an antecedent claim *against any person*, whether or not the claim is due[.]" *Id.* at § 355.3-303(1)(c) (emphasis added). Moreover, to the extent ITS relied on Mr. Siegel's testimony to the effect that any notes payable to Bowie "went away," the Bankruptcy Court properly excluded that testimony, for the reasons set forth above. The Panel similarly finds no error in the Bankruptcy Court's conclusion that "[p]ursuant to the ITS Notes, ITS expressly assumed TLS's debt to Cecelia." (Op. at ¶10, Adv. P. 21-0313, ECF No. 125 (citing Bay Bridge's Exhibits 7 and 8, Adv. P. 21-03013, ECF Nos. 68–11, 68–12).)

The Bankruptcy Court properly drew inferences from the parties' Stipulation and the cited exhibits and took the terms of the notes at face value. Simply put, ITS could not overcome the force of its own promissory notes under applicable law.

### III.  Refusal to Recharacterize the Claim

Over the last two decades, the United States Supreme Court has consistently reminded the lower federal courts to use their equitable powers sparingly, and in a manner consistent with tradition, state law, and federal statutes.[6]  Against these admonitions, the Panel evaluates the Bankruptcy Court's decision to deny ITS's request to recharacterize the Claim.

First, the Panel acknowledges that the Bankruptcy Code does not provide specific statutory authority to recharacterize the Claim.  Thus, recharacterization falls squarely into the arena of judicially created doctrine based on equitable power.  As the Sixth Circuit noted in *AutoStyle*, bankruptcy courts' power to recharacterize a claim as equity "stems from the authority vested in the bankruptcy courts to use their equitable powers to test the validity of debts[,]" a power evidently derived from § 105 of the Bankruptcy Code.  *AutoStyle*, 269 F.3d at 748 (citation omitted).  In this respect, it is fair to say that recharacterization is part of the claims allowance (and disallowance) process authorizing disallowance of a claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]"  11 U.S.C § 502(b)(1).  The Sixth Circuit observed that "[r]echaracterization cases 'turn on whether a debt actually exists, not on whether the claim should be equitably subordinated.'"  *AutoStyle,* 269 F.3d at 748 (quoting Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 510(c) Equitable Subordination?*, 56 Wash. & Lee L. Rev. 689, 716 (1999)).

While ITS has only cited cases where the holder of the purported claim to be recharacterized was held by a party that was either an insider or already an equity holder, the Panel will nevertheless examine whether the claim here, which is held by a party that is neither

---

[6]*See, e.g., Taggart v. Lorenzen*, 587 U.S. __, 139 S. Ct. 1795, 1801 (2019) ("the bankruptcy statutes incorporate the traditional standards in equity practice for determining when a party may be held in civil contempt for violating an injunction."); *Law v. Siegel*, 571 U.S. 415, 421, 134 S. Ct. 1188, 1194 (2014) (citations omitted) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 24, 120 S. Ct. 1951, 1957 (2000) ("within the limits of the Code, courts may reorder distributions from the bankruptcy estate, in whole or in part, for the sake of treating legitimate claimants to the estate equitably."); *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19, 119 S. Ct. 1961, 1968 (1999) (citation omitted) ("[T]he substantive prerequisites for obtaining an equitable remedy . . . depend on traditional principles of equity jurisdiction.").

an equity holder nor a statutory insider, can be recharacterized. Recharacterization is not formulaic, and the applicability of the doctrine is not dictated solely by the formalities of the transaction. As the Sixth Circuit recognized in *AutoStyle*, although the targets of the recharacterization in that case purchased participation interests in another entity's loan (without purporting to be creditors), the court found it necessary to consider "whether the defendants' participations in CIT's loan to AutoStyle were in reality loans, or rather a method used to funnel an equity contribution to AutoStyle." *AutoStyle,* 269 F.3d at 749 n.11. At the end of the day, the more a transaction resembles the product of an arm's length negotiation, the more likely it qualifies as a loan. *Id*. at 750.

In other words, the premise of disallowance is 11 U.S.C. § 502(b)(1) and its reference to non-bankruptcy law, not some vague or idiosyncratic notion of equity. Disallowance must be grounded in applicable law, typically state law, albeit with the Bankruptcy Code's gloss given the statutory definition of "claim." The Supreme Court put it this way:

> Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. *See Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161–162, 67 S. Ct. 237, 91 L. Ed. 162 (1946). The "basic federal rule" in bankruptcy is that state law governs the substance of claims, *Butner, supra*, at 57, 99 S. Ct. 914, Congress having "generally left the determination of property rights in the assets of a bankrupt's estate to state law," 440 U.S., at 54, 99 S. Ct. 914 (footnote omitted). "Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 55, 99 S. Ct. 914.

*Raleigh*, 530 U.S. at 20, 120 S. Ct. at 1955; *see also* 28 U.S.C. § 1652. The high court recognized a small reservoir of equitable power, but pointedly reminded courts to exercise that power with an eye on the Bankruptcy Code and applicable law:

> Bankruptcy courts do indeed have some equitable powers to adjust rights between creditors. *See, e.g.*, § 510(c) (equitable subordination). That is, within the limits of the Code, courts may reorder distributions from the bankruptcy estate, in whole or in part, for the sake of treating legitimate claimants to the estate equitably. But the scope of a bankruptcy court's equitable power must be understood in the light of the principle of bankruptcy law discussed already, that the validity of a claim is

generally a function of underlying substantive law. Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements but are limited to what the Bankruptcy Code itself provides. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228–229, 116 S. Ct. 2106, 135 L.Ed.2d 506 (1996); *United States v. Noland*, 517 U.S. 535, 543, 116 S. Ct. 1524, 134 L.Ed.2d 748 (1996).

*Raleigh*, 530 U.S. at 24–25, 120 S. Ct. at 1957. More recently, the Supreme Court warned bankruptcy courts to stay within the statutory lines and not stray too far from the text of the Bankruptcy Code, even when addressing situations that may appear inequitable. *Siegel*, 571 U.S. at 421, 134 S. Ct. at 1194–95.

Mindful of these dictates, and based upon the present record, the Panel shares the Bankruptcy Court's reluctance to use recharacterization to disallow a claim derived from an entity (Cecelia) who itself holds no interest or control over the debtor. As ITS's counsel conceded at oral argument, this expansion of *AutoStyle* would be without precedent in our Circuit. Even the decision in *Aquino v. Black* (*In re AtlanticRancher, Inc.*), 279 B.R. 411 (Bankr. D. Mass. 2002), mentioned as the only opinion counsel could find in which a court recharacterized the claim of a non-shareholder, involved substantial evidence that the purported creditor was an insider. *Id.* at 435 (finding that purported creditor was "insider" under § 101(31)(B)(iii) in view of his pervasive control of the debtor under loan documents). Beyond the statements of counsel about the corporate relationships, the record in the present case only hints at such control, relying heavily on inferences drawn from corporate relationships which alone do not warrant insider treatment. *See Spradlin v. Monday Coal, LLC* (*In re Licking River Mining*, *LLC*), 571 B.R. 241, 254 (Bankr. E.D. Ky. 2017) (the mere fact that an entity is owned and controlled by any insider of the debtor does not make that entity an insider of the debtor).

Here, without the benefit of Mr. Siegel's testimony, the closest ITS comes to proving relationships between the purported creditor and the debtor that invariably accompany other recharacterization decisions is limited to three paragraphs within the Stipulation between ITS and Bay Bridge, which establish only the following:

- John J. Siegel, Jr. ("Siegel") was the non-member Manager of ITS from the Formation Date until November 5, 2020;

- ITS's sole member was Insight Terminal Holdings, LLC ("ITH"), and Siegel's wife was ITH's sole member;

- Siegel was the non-member Manager of Cecelia, and Siegel's wife and two adult children are the owners of Cecelia, either directly or indirectly.

(Stipulation at ¶¶ 2–4, Adv. P. 21-0313, ECF No. 106.)  While it may be tempting to infer control—a task assigned to the trial court as factfinder—these sorts of relationships, without more, do not require such a finding.[7]  In other words, related companies are not per se precluded from making loans to sister companies in a family of closely held entities.  It is not surprising, therefore, on this record, that the Bankruptcy Court balked at applying recharacterization.[8]

Even if the Panel were to assume that recharacterization is allowable given the stipulated relationships in this appeal and the flexibility expressed in the *AutoStyle* opinion, reversing the

---

[7]Inference plays different roles at different stages of the proceedings.  Here, for example, by entering summary judgment recharacterizing the claims of Oasis and Halas when those putative creditors failed to oppose Insight's Rule 56 motion, the Bankruptcy Court simply concluded on the summary judgment record (1) that a jury could find that those entities made capital contributions rather than loans, and (2) that the opposing parties did not raise a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55, 106 S. Ct. 2505, 2513 (1986) ("The question [under Rule 56] is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.").  Saying that a jury *could* find for the moving party by a preponderance of the uncontested evidence presented on a Rule 56 motion is a far cry from saying that the actual finder of fact, after trial, must do so.  The roles and records are different.  *Cf. Dupree v. Younger,* 598 U.S. 729, 735–36, 143 S. Ct. 1382, 1389 (2023) ("an appellate court's review of factual challenges after a trial is rooted in the complete trial record, which means that a district court's factual rulings based on the obsolete summary-judgment record are useless.").  At trial, the Bankruptcy Court was free to draw its own inferences.  These differences explain how the Bankruptcy Court could enter an order recharacterizing the Oasis and Halas claims at the summary judgment stage but decline to do so after trial on the Cecelia Claim.

[8]The Panel recognizes that the sixth *AutoStyle* factor (which considers the proportion of the advance to the claimant's stock ownership) is but one of several factors to be considered in the recharacterization analysis, and that "[n]o one factor is controlling or decisive."  *AutoStyle*, 269 F.3d at 750, 751–52.  Nevertheless, recharacterizing a non-equity holder's "claim" as "equity" is counter-intuitive: the Panel has found no caselaw within our circuit in which a mere creditor whose claim is challenged ends up holding an equity interest in the debtor.  Ordinarily, a creditor who asserts no equity interest in a debtor and who suffers a successful challenge to its claim ends up holding a disallowed or subordinated claim, not an equity interest.  This likely explains the inability of ITS's counsel to cite a single case in which a non-owner, non-insider suffered that fate.  Moreover, although recognizing a phantom equity interest in the process of recharacterizing a claim generally has no practical effect where the distribution waterfall does not reach equity, it could have reverberations in a subchapter V small business case where Congress has suspended the absolute priority rule.  *See* 11 U.S.C. §1181(a) (making §1129(b) inapplicable in subchapter V cases); *see also* 11 U.S.C. §1191(c) (establishing requirements for nonconsensual plan in subchapter V cases).  The recognition of informal equity interests, like the disallowance of claims, is probably best left to applicable non-bankruptcy law.

Bankruptcy Court would be anathema to the very deferential standard of review under Rule 52(a)(6), applicable both to oral and documentary evidence.[9]  Fed. R. Bankr. P. 7052 (making Fed. R. Civ. P. 52 generally applicable in adversary proceedings).

Although the Bankruptcy Court observed, perhaps with some overstatement, that the *AutoStyle* factors were "inapplicable here because Cecelia was not an equity owner of TLS or ITS," (Op. at ¶ 19, Adv. P. 21-03013, ECF No. 125), the court thoughtfully considered those inherently fact-based factors, drawing reasonable and permissible inferences, before further concluding that ITS failed to establish its case for recharacterization.  Several *AutoStyle* factors pointed decidedly against recharacterization, such as the names of the transaction documents (promissory notes), the maturity on demand, and the fixed rate of interest (6%) payable in kind, for example.  Other factors pointing to the loan side of the spectrum also found support in the record, such as the prior testimony from Vikas Tandon, the source of repayment (here, the "monetization" of the Oakland terminal lease), the ratio of the advance in proportion to stock ownership, and the debtor's ability to obtain outside funding (here, from Autumn Wind Lending, LLC, and Bay Bridge).  Even if other factors favored recharacterization as equity (such as the absence of security or a sinking fund), or were neutral, the Sixth Circuit teaches that no one factor is controlling.  More to the point, given the present posture of the matter and the deferential standard of review, "[t]he determination of whether advances to a corporation are loans or capital contributions depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances." *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986) (citation omitted).  The intention of the parties to a transaction, in the end, presents a factual question for the trial court to resolve.

Having considered the entire record on appeal, the Panel finds no basis for disturbing the Bankruptcy Court's factual findings, which do not appear erroneous, let alone clearly so, and perceives no point in adding to the Bankruptcy Court's careful and sure-footed opinion.

---

[9]For example, a trial court's evidentiary rulings are reviewed for abuse of discretion resulting in more than merely harmless error. *In re Pertuset*, No. 12-8014, 2012 WL 6598444, 485 B.R. 478 (table) (B.A.P. 6th Cir. 2012). The Panel is hard-pressed to criticize the Bankruptcy Court's decision not to admit Mr. Siegel's testimony when his death precluded cross-examination.  Similarly, the Panel would be barred from disturbing the Bankruptcy Court's inherently fact-bound balancing of the factors set forth in *AutoStyle*, 269 F.3d at 747–53 (6th Cir. 2001), except for clear error, which the Appellant has not shown.

ITS's view of the evidence is certainly permissible, but so was Bay Bridge's. The Panel respects the trial court's role in evaluating evidence, and "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74, 105 S. Ct. 1504, 1511 (1985) (citation omitted).

The Panel finds no error in the Bankruptcy Court's rejection of ITS's demand to recharacterize the Claim as equity.

## CONCLUSION

Before trial, the preponderance of the evidence standard applicable to the exercise of original jurisdiction in a civil matter and the uncertain outcome of several evidentiary rulings (especially involving Mr. Siegel's former testimony), likely explained ITS's willingness to pursue recharacterization with such vigor. After the trial court made its evidentiary rulings and factual findings against recharacterization, however, the continued pursuit of relief in this inherently fact-bound matter appears more quixotic. The judgment under review involves trial court decisions that appellate courts do not lightly disturb, especially with respect to evidentiary rulings and findings of fact. On the present record, and especially given the thoughtful and well-crafted opinion of the Bankruptcy Court, the judgment is AFFIRMED.